## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SANDRA BURTON,                            :
                                         :
            Plaintiff,                   :
                                         :
       v.                                :        Civil Action No. 12-1537 (GK)
                                         :
SHAUN DONOVAN, Secretary of              :
U.S. Department of Housing and           :
Urban Development,                       :
                                         :
            Defendant.                   :

### Memorandum Opinion

Plaintiff Sandra Burton ("Plaintiff," "Burton") brings this lawsuit against the Secretary of

the United States Department of Housing and Urban Development ("Defendant," "Government,"

or "HUD"). Plaintiff alleges two counts of retaliation in violation of Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. §2000e et seq. Amended Complaint ("AC") ¶¶ 34-44 [Dkt.

No. 31].

Plaintiff alleges she was retaliated against because she had previously complained of racial

discrimination by a supervisor at HUD. See generally FAC. Plaintiff seeks to prove retaliation on

the basis of both: 1) discrete, materially adverse actions taken by HUD, including multiple

suspensions and her forced resignation, AC ¶¶ 37, 42; and 2) a hostile work environment.[1] AC ¶

---

[1] Though Plaintiff's Amended Complaint contains two counts of retaliation, she does not identify either count to be based solely on her hostile work environment claim. Similarly, she does not identify either count to be based solely on her claim that she was subject to discrete acts of retaliation. Both counts contain references to discrete retaliatory acts, AC ¶¶ 37, 42 (both referring to discipline against Plaintiff), and to a hostile work environment. AC ¶ 37 (describing retaliation as including "heightened hostility") and AC ¶ 42 (describing retaliation as including "constant and ongoing hostility"). Accordingly, and because no party has suggested otherwise, the Court will treat each count of Plaintiff's Amended Complaint as encompassing both the claim that she was subject to discrete acts of retaliation and the claim that she was subject to a hostile work environment.

33. Plaintiff claims to have suffered severe emotional distress, mental anguish, and economic harm as a result of this retaliation and seeks $300,000, plus interest, in compensatory damages for each count of retaliation. AC ¶¶ 39, 44. In addition, Plaintiff seeks attorney's fees and costs. Id.

Defendant filed a Motion for Summary Judgment on December 7, 2015 ("Def.'s Mot."). [Dkt. No. 58]. Plaintiff filed an Opposition on January 11, 2016, [Dkt. No. 64], which she then corrected on January 13, 2016 ("Pl.'s Corr. Opp'n"). [Dkt. No. 65]. Defendant filed its Reply on February 26, 2016 ("Def.'s Reply"). [Dkt. No. 69]. Upon consideration of the Motion, Corrected Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendant's Motion for Summary Judgment is denied.

## I. Background

### A. Factual Background

#### i. Burton's Initial Employment at HUD and Original Complaint of Discrimination

Sandra Burton, a white woman, was hired by the United States Department of Housing and Urban Development (HUD) in 2006. AC ¶ 7 [Dkt. No. 31]. Initially, Burton worked as a Contract Specialist in the Office of the Chief Procurement Officer ("OCPO"). Id. In 2008, Burton filed a complaint ("2008 EEO Complaint") with HUD's Equal Employment Opportunity ("EEO") Office against her then-supervisor, Dana Long, accusing Ms. Long of discriminating against her on the basis of race. Id. ¶ 8.

In February 2009, Burton and HUD entered into a settlement agreement ("2009 EEO Settlement") to resolve the 2008 EEO Complaint. AC ¶¶ 9, 10. Pursuant to the 2009 EEO Settlement, Burton was transferred to a new office within OCPO, placed under a new supervisor, and allowed to telework. Id. From November 2009 to June 2010, Jemine Bryon, Chief Procurement Officer in OCPO, was Burton's immediate supervisor in this new position. Id. ¶ 12.

2

Beginning on or about June 8, 2010, Elie Stowe became Burton's immediate supervisor. Id. ¶ 13. Bryon became a senior supervisor in Burton's supervisory chain. Id. ¶ 17.

### ii. Issues Arise between Burton and Stowe

Burton alleges that sometime in early August of 2010, Stowe asked to see a copy of the 2009 EEO Settlement. AC ¶ 14. Burton alleges that she and Stowe began to have problems shortly thereafter. For example, Burton alleges that, starting as early as August of 2010 and no later than September of 2010, Stowe began encouraging Burton to either retire or seek other employment, despite the fact that Burton had never expressed a desire to do either. Ex. 26 to Pl.'s Corr. Opp'n [Dkt. No. 65-6 at pp. 47-49]. Burton also alleges that during this time period Stowe repeatedly told Burton that Bryon "hated" her. Id. [Dkt. No. 65-6 at p. 46]. Additionally, Burton alleges that beginning in late September Stowe began to falsely accuse Burton of not being at her assigned station and failing to answer calls while she was teleworking. Id. [Dkt. No. 65-6 at p. 47]. Burton further alleges that Stowe threatened to discipline her as a consequence. Id. Finally, Burton alleges that during this time period Stowe asked Burton whether she had retained an attorney. Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at p. 11].

### iii. Incidents Leading to the 5-Day Suspension of Burton in 2011

On August 25, 2010, a dispute arose between Burton and another colleague, Erma Ellis-Stewart, Ex. 26 to Pl.'s Corr. Opp'n [Dkt. No.65-6 at pp. 54-55]; the exact nature of this dispute is unclear. Id. According to Defendant, Burton behaved in an unprofessional manner by "interrogating" Ms. Ellis-Stewart. Ex. 7 to Pl.'s Corr. Opp'n [Dkt. No. 65-4 at p. 15]. According to Burton, it was Ms. Ellis-Stewart who yelled and then made a false report to management regarding Burton's behavior. Ex. 26 to Pl.'s Corr. Opp'n [Dkt. No. 65-6 at pp. 54-55]. Burton alleges that Stowe and Bryon then demanded that she document her description of the incident in

writing, and that when she declined to do so, Stowe threatened that she was in even "bigger trouble." Id. [Dkt. No. 65-6 at p. 55].

On November 17 and 18, 2010, another series of incidents occurred between Burton and Stowe. On November 17, Stowe called Burton into her office to discuss Burton's practice of copying senior managers on emails. AC ¶ 17. The Government asserts that this was in violation of a directive Stowe had previously given Burton to refrain from doing so. Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at p. 5]. From here, Stowe and Burton's versions of events diverge dramatically.

Burton alleges that Stowe berated her, yelling loudly, cursing, and telling Burton "I got you now." Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at pp. 12-13]; see also Ex. 2 to Pl.'s Corr. Opp'n [Dkt. No. 65-4 at pp. 32-37]. Burton alleges that she remained calm throughout this encounter. Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at pp. 12-13].

The Government tells a quite different tale. In a document entitled "Statement of Facts" and drafted by Stowe on November 17, 2010, she recounts that it was Burton who yelled, cursed, and acted in an unprofessional and insubordinate manner. Stowe claimed that, in contrast, she was the one who remained calm throughout the encounter. Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at p. 5].

The next day, November 18, 2010, a series of emails were exchanged in which Stowe asked Burton to complete certain assignments. Ex. 8 to Pl.'s Corr. Opp'n, [Dkt. No. #65-5 at pp. 6-8]. In her responses to Stowe, Burton again copied senior managers, specifically Keith Surber and Bryon. Id. Burton's responses also accused Stowe of "lying" and engaging in "abusive behavior," and suggested that Stowe, rather than Burton, needed to be disciplined in some manner. Id. [Dkt. No. 65-5 at p. 8.]

Later that same day, Bryon issued a Notification of Administrative Leave and Enforced Leave, placing Burton on administrative leave for three days and enforced leave for 14 days. Ex. 7 to Pl.'s Corr. Opp'n [Dkt. No. 65-4 at pp. 158 - 159]. As justification for this action, Bryon relied on: Stowe's account of Burton's conduct in the November 17 meeting, where she purportedly "engaged in a heated verbal altercation" with Stowe and was "extremely physically demonstrative, in a threatening manner"; the November 18 emails, in which Burton continued copying senior management and called Stowe a liar; and the August 25 incident with Ms. Ellis-Stewart. Id. Bryon concluded that Burton had engaged in repeated unprofessional and insubordinate conduct and that her continued "presence in the workplace may present an immediate threat to the health and safety of coworkers." Id.

On December 16, 2010, Stowe issued a Proposal to Suspend Burton for five days. Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. 65-5 at pp. 2-3]. On January 31, 2011, Bryon upheld Stowe's Proposal, suspended Burton for five days, and also issued her a Memorandum of Counseling. Ex. 5 to Def.'s Mot. [Dkt. No. 59-4]; Ex. 7 to Def.'s Mot. [Dkt. No. 59-6]. Both the Proposal to Suspend and the Suspension were based primarily on Stowe's account of Burton's allegedly unprofessional conduct in the November 17. Ex. 4 to Def.'s Mot. [Dkt. No. #59-3]; Ex. 5 to Def.'s Mot. [Dkt. No. #59-4].

### iv. Incidents Leading to the 30-Day Suspension of Burton in 2011

Over the course of February 14, 15, and 24, 2011, another series of incidents transpired between Stowe and Burton, which led to Burton being suspended for 30 days. Ex. 8 to Def.'s Mot. [Dkt. No. 59-7]. In a series of emails exchanged between Burton and Stowe on February 14, 2011, Stowe assigned Burton a time-sensitive task that was to be completed by the close of business. Id. [Dkt. No. 59-7 at pp. 6-9]. Burton refused to work on it. Id. The next day, with the project

5

apparently still incomplete, Stowe denied Burton's request for leave. Nonetheless, Burton took leave to attend to unspecified appointments. Id. As a result, Stowe determined that Burton was Absent Without Leave ("AWOL"). Id. [Dkt. No. 59-7 at pp. 2-3]. Stowe alleges that, in response, Burton twice came to her office on February 24, 2011, and once again loudly berated her. Id.

As with the previous incidents in November 2010, Burton provides a wholly divergent account of what transpired. Burton claims: she attempted to complete the project assigned to her on February 14; that given its complexity, it was not possible to complete it within the originally specified timeframe; she communicated this to Stowe, and they orally agreed that Burton would complete it by February 15; and that Burton successfully did so. Ex. 10 to Pl.'s Corr. Opp'n [Dkt. No. 65-5 at pp. 27-28]. Similarly, Burton claims that her leave request was orally granted by Stowe on February 14, and that Stowe reneged on their agreement the next morning for the purpose of finding her AWOL. Id. [Dkt. No. 65-5 at p. 29]. Finally, Burton denies that she yelled or cursed at Stowe on February 24, and alleges that Stowe's account of their conversations that day is false. Id. [Dkt. No. 65-5 at pp. 31-32].

On March 9, 2011, Stowe proposed suspending Burton for 30 days on the basis of these incidents, charging that she failed to follow a lawful order, that she was AWOL, and that she was unprofessional in her conduct and language. Ex. 8 to Def.'s Mot. [Dkt. No. 59-7 at pp. 2-5]. Subsequently, on May 8, 2011, Bryon upheld the Proposal to Suspend Burton for 30 days. Ex. 9 to Def.'s Mot. [Dkt. No. 59-8]. In her decision, Bryon sustained each of the charges made by Stowe. Id. [Dkt. No. 59-8 at 3].

### v. Proposal to Remove Burton and Her Subsequent Resignation

At some point following Stowe's March 9, 2011 issuance of the Proposal to Suspend Burton for 30 days, David Blocker replaced Stowe as Burton's direct supervisor. See AC ¶ 32.

6

The record contains a number of email exchanges from July 2011 among Burton, Blocker, and other HUD employees, in which Burton copies individuals outside her office, including her attorney, despite previous instructions not to do so. Ex. 10 to Def.'s Mot. [Dkt. No. 59-9 at pp. 10-26]. In a number of other email exchanges between Burton and Blocker, Blocker appears to make some request of Burton, which Burton refuses to comply with. Id.

On September 22, 2011, Blocker issued a Proposal to Remove Burton from her position at HUD. Ex. 10 to Def.'s Mot. [Dkt. No. 59-9]. Relying on the July 2011 emails, Blocker accused Burton of failing to follow instructions and conduct unbecoming a federal employee. Id. In light of her past disciplinary record, Blocker proposed removing her from federal employment. Id. Blocker stated that he considered the Douglas factors in determining that removal was appropriate.[2] Id. (citing Douglas v. Veterans Admin., 5 M.S.P.R. 280 (M.S.P.B. 1981)). Burton was placed on indefinite administrative leave the same day. Id.

Before she could be removed from her position, Burton resigned. Complaint ¶ 33; Ex. 12 to Def.'s Mot. [Dkt. No. 58-11]. Subsequently, on January 9, 2012, Keith Surber, a senior manager within OCPO, ratified Blocker's Proposal to Remove Burton. Ex. 11 to Def.'s Mot. Again, this decision purported to apply the Douglas factors. Id.

---

[2] Under the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), civil servants such as Burton may be disciplined where the charges against them are supported by a preponderance of the evidence and the penalty imposed is reasonable. See Vickers v. Powell, 493 F.3d 186, 191 (D.C. Cir. 2007). The Douglas factors are used to determine whether a penalty is reasonable. Id.; see also Bloom v. McHugh, 828 F. Supp. 2d 43 (D.D.C. 2011) (reviewing a challenge to an agency's application of the Douglas factors in the imposition of a suspension).

### vi.  Burton's Ongoing Attempts to Raise the Issue of Alleged Retaliation Throughout this Time Period

Throughout much of the relevant time period discussed above, Burton complained that she was being disciplined in retaliation for her prior 2008 EEO complaint and 2009 EEO Settlement. Burton first claimed that she was being retaliated against on December 8, 2010, shortly after her return from administrative leave, in a letter sent by her lawyer to Defendant. Ex. 9 to Pl.'s Corr. Opp'n [Dkt. No. 65-5 at pp. 18-20]. On December 9, 2010, Burton sent an email to Bryon, stating that Stowe was retaliating against her because of her prior EEO activity. Ex. 23 to Pl.'s Corr. Opp'n [Dkt. No. 65-6 at p. 25.] On January 28, 2011, before her 5-day suspension, Burton's attorney contacted HUD's EEO office to informally complain about alleged retaliation.[3] Ex. 11 to Pl.'s Corr. Opp'n [Dkt. No. 65-5 at 36].

Finally, on March 10, 2011, the day after Stowe issued the Proposal to Suspend Burton for 30 days, she filed a formal EEO complaint against HUD ("2011 EEO Retaliation Complaint"). AC ¶ 2. In the 2011 EEO Retaliation Complaint, she names Stowe, Bryon, Surber, and Priscilla Lewis as the individuals who retaliated against her. Ex. 11 to Pl.'s Corr. Opp'n [Dkt. No. 65-5 at p. 38]. An investigation of the 2011 EEO Retaliation Complaint was conducted, but the results of the investigation are not evident from the record. See Ex. 1 to Pl.'s Corr. Opp'n [Dkt. No. 65-4 at pp. 9-10] (emails in October and November 2011 indicating investigation was nearing an end); Exs. 4 and 5 to Pl.'s Corr. Opp'n [Dkt. No. 65-4] (affidavits from Stowe and Lewis, filed in response to the EEO investigation). Plaintiff was issued a right to sue letter on or about June 18, 2012. AC ¶ 3.

---

[3] The document lists the date the attorney contacted the offices as "January 28, 2010," but given that all the underlying factual matter discussed in the letter post-dates January 28, 2010, and that the letter itself was written on March 10, 2011, it is evident to the Court that this is a typo and that the letter should say "January 28, 2011."

### B. Procedural Background

On September 17, 2012, pursuant to 42 U.S.C. § 2000e-16(c), Burton filed her Complaint against Defendant, alleging two counts of retaliation under Title VII of the Civil Rights Act of 1964. Pl.'s Complaint [Dkt. No. 1]. Plaintiff amended her Complaint on July 17, 2014. See generally AC.

Following the filing of Plaintiff's Complaint, the Parties engaged in a significant amount of discovery, which ended on October, 30, 2015. The Government then filed its Motion for Summary Judgment on December, 8, 2015. Def.'s Mot. [Dkt. No. 58]. Plaintiff filed her Opposition on January, 11, 2016, and then a corrected Opposition on January 13, 2016. Pl.'s Corr. Opp'n [Dkt. No. 65]. The Government filed its Reply to Plaintiff's Opposition on February 2, 2016. Def.'s Reply [Dkt. No. 69].

## II.     Standard of Review

Summary judgment may be granted only if the pleadings, the discovery materials, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006); Fed. R. Civ. P. 56(c). "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Arrington, 473 F.3d at 333 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. Id.

The burden is on the moving party to demonstrate the absence of any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When a moving party successfully does so, the nonmoving party must show the existence of a genuine issue of material fact by providing "specific facts showing that there is a genuine issue for trial," and "may not rest

9

on mere allegations or denials" to prevail. Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248 (internal quotation marks omitted). The moving party is entitled to summary judgment when the nonmoving party fails to offer evidence sufficient to establish an essential element of a claim on which it will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

In reviewing the evidence on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws all inferences in her favor. Johnson v. Perez, 823 F.3d 701, 705 (D.C. Cir. 2016). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." Barnett v. PA Consulting Grp. Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks and citation omitted). Accordingly, the Court's role is "not [to] determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." Id.

## III.   Analysis

### A. Title VII Retaliation Standard

"Title VII prohibits the federal government from...retaliating against employees for engaging in activity protected by Title VII." Montgomery v. Chao, 546 F.3d 703, 706, (D.C. Cir. 2008)). To prove unlawful retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) that the employer took a materially adverse action against her; and (3) that the employer took the action "because" the employee engaged in protected activity. McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012).

Here, there is no real dispute as to whether Plaintiff engaged in protected activity.[4] Instead, the issues in dispute are whether Plaintiff was subjected to materially adverse actions, and if so, whether those actions were "because" of her prior EEO activity – i.e. the motive for those actions.

### B.  Adverse Action

The parties appear to agree that Plaintiff was subjected to the following materially adverse actions: 1) the administrative and enforced leave in November 2010; 2) the five-day suspension; 3) the issuance of a memorandum of counseling; and 4) the 30-day suspension.[5]  See Pl.'s Corr. Opp'n at 12; Def.'s Mot. at [11-13]; Def.'s Reply at 3.

The Government also appears to concede that the Plaintiff's resignation following the Notice of Proposal to Remove would constitute a materially adverse action if she could successfully show that she was constructively discharged. Def.'s Reply at 3 n.2. However, the Government contends that a resignation in the face of a proposed removal for-cause can never constitute a constructive discharge. Def.'s Reply at 7. For this proposition, the Government relies on Keyes v. District of Columbia, 372 F.3d 434, 439-40 (D.C. Cir. 2004), in which our Court of Appeals held that a resignation in the face of imminent removal is presumed to be voluntary. Id.

The Government overlooks Aliotta v. Bair, 614 F.3d 556, 566-67 (D.C. Cir. 2010). There, our Court of Appeals expressly held that "the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary." Id. at

---

[4] The Government concedes, as it must, that both Plaintiff's 2008 EEO Complaint and 2011 EEO Retaliation Complaint constitute protected activity.  See Def.'s Reply at 1-3.

[5] At one point in its Motion for Summary Judgment the Government suggests that the Plaintiff cannot show that she was subject to materially adverse actions. Def.'s Mot. at 7. However, later in its Motion for Summary Judgment, as well as in its Reply, the Government concedes that Plaintiff was subject to materially adverse actions. Id. at 11-13; Def.'s Reply at 3.

566 (discussing Keyes); see also Ross v. U.S. Capitol Police, 14-cv-1400, 2016 WL 3659888 at

*14-15 (D.D.C. 2016) (holding that a constructive discharge is a materially adverse action for

purposes of a Title VII retaliation claim). "The test for constructive discharge is an objective one:

whether a reasonable person in the employee's position would have felt compelled to resign under

the circumstances." Aliotta, 614 F.3d at 566.

Here, the Court has no difficulty finding that a reasonable jury could conclude that the test

is satisfied. After a series of escalating disciplinary actions, Plaintiff was confronted with a formal

proposal to terminate her federal employment, and was simultaneously placed on indefinite

administrative leave. Ex. 10 to Def.'s Mot. [Dkt. No. 59-9].  Plaintiff faced the prospect of losing

valuable retirement benefits accrued from nearly 35 years of federal service if she were

successfully terminated for-cause. AC at ¶ 33.  Under such circumstances, it would be evident to

any reasonable employee that they were about to be terminated and that resignation was the only

available option.[6] See Ross, 2016 WL 3659888 at *12 (overt threats of termination are sufficient

to establish constructive discharge.)

Therefore, the Court concludes that a reasonable jury could conclude that Plaintiff was

constructively discharged.  Because the parties are in agreement that the other disciplinary actions

were also materially adverse, the only remaining question in dispute is the motive for these actions.

## C. Inference of Retaliatory Motive

Where a plaintiff attempts to prove unlawful retaliation in violation of Title VII using

circumstantial evidence of motive, the burden-shifting framework of McDonnell Douglas

ordinarily applies. Allen v. Johnson, 795 F.3d 34, 39 (D.C. Cir. 2015) (citing McDonnell Douglas

---

[6] That HUD did in fact intend to terminate Plaintiff is only further confirmed by the fact that
HUD formally ratified the Proposal to Remove her *even after she had retired.*

Corp. v. Green, 411 U.S. 792 (1973)). However, our Court of Appeals has instructed that application of the McDonnell Douglas framework is inappropriate when deciding a motion for summary judgment.[7] Id. Instead, the sole question is whether the true motive for the materially adverse actions taken against the employee was impermissible retaliation. Id.

Where an employer has given non-retaliatory reasons for the adverse actions suffered by the plaintiff, she may claim an inference that these reasons are pretextual – and that the real motive was retaliation – by producing evidence of the employer's "inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or *other relevant evidence* that a jury could reasonably conclude evinces an illicit motive." Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (emphasis added).

Such other relevant evidence can include "temporal proximity between an employer's knowledge of protected activity and an adverse employment action." Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001); see also Jones v. Bernanke, 557 F.3d 670, 679-80 (D.C. Cir. 2009). "Plaintiffs may survive summary judgment based solely on evidence of pretext when the evidence is such that a reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason." Walker, 798 F.3d at 1096.

The Government argues that it is entitled to summary judgment because there were valid, non-retaliatory reasons for disciplining Plaintiff and she has produced no evidence suggesting that

---

[7] Our Court of Appeals has instructed that "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas," describing such an inquiry as a "largely unnecessary sideshow." Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in the original); see also Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016).

those reasons were pretextual. The Government asserts that it has produced undisputed evidence that Plaintiff was insubordinate and acted unprofessionally, and was therefore disciplined for entirely valid business reasons. Def.'s Reply at 4-5; Def.'s Mot. at 11-13.

In addition, the Government contends that, in contrast, Plaintiff has failed to produce any evidence explaining why her supervisors would wish to retaliate against her when they were not the subject of her earlier 2008 EEO Complaint.[8] Def.'s Mot. at 9 (arguing that retaliatory motive should not be inferred where the new supervisor was not the target of the prior complaint) (citing Mokhtar v. Kerry, 83 F. Supp. 3d 49, 82 (D.D.C. 2015) and Vickers, 493 F.3d at 195-96). The Government contends that, in lieu of actual evidence, Plaintiff has provided only "conclusory statements of personal opinion." Def.'s Reply at 4, ECF #69 (citing Pardo-Kronemann v. Donovan, 601 F.3d 599, 611 (D.C. Cir. 2010)).

Plaintiff responds that she has produced evidence from which a jury could reasonably conclude that the Government's stated reasons were pretextual and that the real reason for disciplining her was retaliation. Plaintiff points to the temporal proximity between her supervisors' knowledge of her prior EEO complaint and adverse actions, a pattern of inconsistent or dishonest explanations for the discipline she received, as well as other evidence.

While the Government has the stronger argument with respect to Bryon, Surber, Lewis, and Blocker, as to whom the Plaintiff has produced little evidence of retaliatory animus, the same cannot be said of Plaintiff's direct supervisor, Stowe. Plaintiff alleges that Stowe learned of her prior protected activity, and shortly thereafter began encouraging her to seek other employment or resign. Ex. 26 to Pl.'s Corr. Opp'n [Dkt. No. 65-6 at pp. 47-49]. Plaintiff further alleges that when

---

[8] In her Amended Complaint Plaintiff identifies Jemine Bryon, Keith Surber, Priscilla Lewis, Elie Stowe, and David Blocker as the individuals who retaliated against her. See AC.

she failed to take the hint, Stowe began an escalating campaign of threats and intimidation to force

her from the agency. Id.  When even this proved insufficient, Plaintiff alleges that Stowe began

fabricating accounts of Plaintiff's misbehavior and, as Plaintiff's immediate supervisor, used those

false accounts to impose increasingly punitive disciplinary measures on Plaintiff. Ex. 8 to Pl.'s

Corr. Opp'n [Dkt. No. #65-5 at pp. 12-13]; see also Ex. 2 to Pl.'s Corr. Opp'n [Dkt. No. 65-4 at

pp. 32-37].  Ultimately, Plaintiff claims this led to her forced resignation from HUD. Pl.'s Corr.

Opp'n at 1, 11.

    Viewing the evidence in its totality and in a light most favorable to Plaintiff, and drawing

all reasonable inferences in her favor, the Court finds that a jury could credit Plaintiff's account of

events and reasonably conclude that it was Stowe's retaliatory animus, and not the otherwise

legitimate reasons given by the Government, that caused the disciplinary actions against Plaintiff.

Thus, there is a genuine dispute as to a material fact, the motive for disciplining Plaintiff.

### i. The Close Temporal Proximity Between the Time Stowe Learned of Plaintiff's Prior Protected Activity and the Time She Began her Hostile Treatment of Plaintiff Suggests Retaliation

    Here, Plaintiff produces evidence showing that Stowe sought to encourage Plaintiff to leave

her job within weeks of learning of her prior protected activity.  According to Plaintiff, no more

than a few weeks after Stowe gained this knowledge, Stowe began regularly telling Plaintiff that

her superior, Bryon, hated her and encouraging her to retire or resign. Pl.'s Corr. Opp'n at 5; Ex.

26 to Pl.'s Corr. Opp'n [Dkt. No. 65-6 at pp. 47-49].  Plaintiff alleges that when she showed no

interest in doing so, Stowe began attempting to intimidate or harass her, falsely accusing her of

being away from her telework duty station and threatening to write her up. Ex. 26 to Pl.'s Corr.

Opp'n [Dkt. No. 65-6 at pp. 47-49].  Such evidence of temporal proximity supports an inference

that Stowe wanted to be rid of Plaintiff because of her prior protected activity, especially when

viewed in the context of the other evidence produced by Plaintiff, discussed below. See Breeden,

532 U.S. at 273 (approvingly citing O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001) (a six week gap is sufficient, in itself, to establish an inference of retaliation)); Jones, 557 F.3d at 679-80 (temporal evidence must be viewed in its full context).

The Government argues that the period of time that elapsed between Plaintiff's 2008 EEO complaint and 2009 EEO Settlement and when the adverse actions were taken against Plaintiff is simply too long to infer retaliation. Therefore, the Government contends that the Court must disregard Plaintiff's evidence of temporal proximity.

The Government is certainly correct that a three to four month gap between protected activity and an adverse action is insufficient, *on its own*, to establish an inference of retaliation. Def.'s Mot. at 10 (citing Mokhtar, 83 F. Supp. 3d at 81; Breeden, 532 U.S. at 273-74)). In this case, Plaintiff alleges a much smaller gap, as few as two or three and no more than eight weeks, between the time when Stowe learned of Plaintiff's prior protected activity and began her campaign to force her from her job. Combined with the additional evidence of pretext Plaintiff has produced, discussed *infra*, that is sufficient to infer that Stowe had an improper motive.

Additionally, the Government argues that it could not retaliate against Plaintiff for her 2011 EEO Retaliation Complaint, filed on March 10, 2011, when it had already suspended her for 5 days and proposed a new 30-day suspension prior to that date. Def.'s Mot. at 10 (citing Breeden, 532 U.S. at 272 (employment actions that are contemplated before an employee engages in protected activity cannot be evidence of retaliation)). Again, the Government's argument misses the mark, because it ignores a central element of Plaintiff's theory of the case - that Stowe's pattern of retaliatory conduct began in August 2010, as soon as she learned of Plaintiff's prior complaint.

Therefore, the Court finds that this evidence supports an inference that Stowe acted with a retaliatory motive.

### ii. Plaintiff Alleges that Stowe Falsified her Account of the Events that Led to Plaintiff's Discipline, Suggesting Retaliation

The Government also argues that even if the Court were to consider Plaintiff's evidence of temporal proximity, Plaintiff cannot survive summary judgment because she has not produced any additional evidence supporting an inference of retaliation. Def.'s Reply at 3 ("positive evidence beyond mere proximity in time is required" (quoting Woodruff v. Peters, 482 F.3d 521, 530 (D.C. Cir. 2007))). But Plaintiff has, in fact, done so.

She has produced evidence that supports her claim that Stowe repeatedly lied about Plaintiff's conduct and that these lies are the foundation for the Government's stated reasons for disciplining her. Pl.'s Corr. Opp'n at 13; see also Morris v. McCarthy, 825 F.3d 658, 671 (D.C. Cir. 2016) (plaintiff can satisfy its burden at summary judgment by "casting doubt on the objective validity of employer's explanation").

For example, Plaintiff's version of the meeting on November 17, 2010, is diametrically opposed to Stowe's, with each accusing the other of yelling and behaving unprofessionally. Compare Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at pp. 12-13], with Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at p. 5]. Indeed, Plaintiff expressly accuses Stowe of lying in her account of that meeting. Ex. 2 to Pl.'s Corr. Opp'n [Dkt. No. 65-4 at pp. 32-37]. Stowe shared her account with management, resulting in Plaintiff being placed on administrative and enforced leave, and then used that account as the primary basis for recommending that Plaintiff be suspended for five days. Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at p. 5].

Similarly, Plaintiff disputes Stowe's account of the events of February 14, 15, and 24, 2011, accusing Stowe not only of giving a partial, misleading account of their interactions, but doing so in order to engineer a situation in which it would appear that Plaintiff was AWOL. Compare Ex. 10 to Pl.'s Corr. Opp'n [Dkt. No. 65-5 at pp. 27-28], with Ex. 8 to Def.'s Mot. [Dkt. No. 59-7].

Again, Stowe would later use her account of what transpired as the basis of her proposal to suspend Plaintiff for 30 days. Ex. 8 to Def.'s Mot. [Dkt. No. 59-7].

This competing evidence embodies the kind of "he said, she said" dispute, resolution of which requires a credibility judgment that is properly left to a jury. See Barnhardt v. District of Columbia, 723 F. Supp. 2d 197, 215-216 (D.D.C. 2010) ("summary judgment is inappropriate because the facts are in diametric opposition"). Plaintiff's account, if accepted by a jury, serves not only to support an inference that the reasons for disciplining her were pretextual but also to buttress her assertion that Stowe was motivated by a desire to retaliate.

Thus, there is a dispute as to Plaintiff's conduct, and this dispute is clearly material.

### iii.  Other Evidence of Stowe's Retaliatory Motive

Other evidence suggests that Stowe was concerned with Plaintiff's prior protected activity, suggesting retaliatory animus. For example, Plaintiff alleges that Stowe, unprompted, requested to see a copy of the 2009 EEO Settlement, an otherwise confidential document. AC ¶ 14; Ex. 26 to Pl.'s Corr. Opp'n [Dkt. No. 65-6 at p. 46]. Such settlements are made confidential for the very purpose of minimizing any potential for retaliation, because a request to see one could be viewed as evidence of an improper concern with prior protected activity.

Furthermore, Plaintiff alleges that, shortly after the request was made, Stowe asked her whether she had an attorney. Ex. 8 to Pl.'s Corr. Opp'n [Dkt. No. #65-5 at p. 11]. This evidence suggests that Stowe was improperly interested in Plaintiff's prior protected activity and the possibility that she might engage in future protected activity, further supporting the inference that Stowe was motivated by a desire to retaliate.

Plaintiff also points to inconsistencies in Stowe's statements as further evidence of retaliation. Pl.'s Corr. Opp'n at 26. Plaintiff notes that Stowe denied ever knowing about the 2008

EEO Complaint or the 2009 EEO Settlement, when first asked during the investigation of Plaintiff's new, 2011 EEO Retaliation Complaint. Ex. 4 to Pl.'s Corr. Opp'n [Dkt. No. 65-4 at pp. 64]. This directly contradicts Plaintiff's evidence that Stowe not only knew of her prior EEO activity, but actively sought that information out. While Stowe later admitted that she did know of Plaintiff's prior protected activity, Id. [Dkt. No. 65-4 at pp. 64], her initial denial could obviously be seen as an attempt to cover up her retaliatory animus.

Finally, Plaintiff provides evidence that Stowe demonstrated animosity to at least one other individual, Tonya Houston, who had also previously engaged in protected activity. Pl.'s Corr. Opp'n at 13. Like Plaintiff, Houston had previously filed an EEO complaint against a different supervisor at HUD. Ex. 22 to Pl.'s Corr. Opp'n. Like Plaintiff, Houston claimed that Stowe learned of Houston's prior EEO activity and that their working relationship subsequently deteriorated. Id. And just as she sought to learn whether Plaintiff had an attorney, Stowe allegedly sought to learn whether Houston had one as well. Ex. 26 to Pl.'s Corr. Opp'n [Dkt. No. 65-6 at p. 49]. Such evidence further supports Plaintiff's argument that Stowe acted with retaliatory animus. Walker, 798 F.3d at 1092 (retaliation can be shown by "employer's pattern of poor treatment of other employees in the same protected group as the plaintiff").

While no single piece of evidence is dispositive, after "considering all the evidence in its full context," the Court readily concludes that a jury could reasonably infer that Plaintiff was subject to materially adverse disciplinary actions because Stowe sought to retaliate against her for her prior, protected EEO activity. See Aka v. Washington Hosp. Center, 156 F.3d 1284 (D.C. Cir. 1998).

### iv.  Stowe Was the Proximate Cause of the Disciplinary Actions Against Plaintiff

Finally, even though Stowe was not the deciding official in any of the disciplinary actions against Plaintiff, the Defendant may still be held liable under a "cat's paw" theory of retaliation. Under such a theory an employer may be held liable where: (1) a supervisor performs an act motivated by retaliatory animus; (2) the act is intended to cause a materially adverse action; and (3) the act is "a *proximate cause*" of the ultimate adverse action. See Morris, 825 F.3d at 668 (emphasis added) (citing Staub v. Proctor Hosp., 562 U.S. 411 (2011)); Walker, 798 F.3d at 1095-96 (recognizing that a cat's paw theory is applicable in retaliation cases). The essential element for succeeding under a cat's paw theory is demonstrating that the retaliatory animus of the supervisor is a "proximate cause" of the adverse action. See Staub, 562 U.S. at 419-22 (discussing the centrality of proximate cause to a cat's paw theory); also Njang v. Whitestone Grp., Inc., 12-cv-0153, 2016 WL 2930889 at *10 (D.D.C. 2016).

Here, Stowe played such an "integral role" in the disciplinary process that if a jury concluded she acted out of retaliatory animus, it could well conclude that her animus was a proximate cause of the disciplinary actions taken against Plaintiff. Walker, 798 F.3d at 1095. In the case of virtually every disciplinary action taken against Plaintiff – whether the administrative and enforced leave, the five-day suspension, the memorandum of counseling, or the thirty-day suspension – it was Stowe who documented the underlying conduct and reported it to Bryon. It was also Stowe who proposed what form the discipline should take. That the ultimate decision maker, Bryon, may not have harbored any retaliatory animus towards Plaintiff cannot "render inoperative" Stowe's motive when HUD expressly relied on Stowe's account of events in determining how to discipline Plaintiff. See id. That is especially true here, because Plaintiff alleges that the account itself is a fabrication born of Stowe's retaliatory animus. As Bryon's

20

decisions to discipline Burton were not "independent of and insulated from" Stowe's influence, a jury could conclude that Stowe's retaliatory acts were a proximate cause of those disciplinary actions. See id. (noting that, in order to break the causal chain, the ultimate decision maker must be "independent of and insulated from" the supervisor who acts with retaliatory motive).

Similarly, the Government argues that that there can be no inference that Plaintiff's constructive discharge was retaliatory, because the official who proposed her removal, Blocker, had no retaliatory animus. Def.'s Reply at 2 n.1; Def.'s Mot. at 10.  As noted previously, Plaintiff has produced little evidence suggesting that Blocker had any desire to retaliate against Plaintiff. Nonetheless, a reasonable jury could conclude that Stowe's desire to retaliate influenced Blocker's Proposal to Remove Plaintiff to such a degree that it was a proximate cause of her constructive discharge.

In proposing to remove Plaintiff, Blocker expressly relied on the prior disciplinary actions taken against Plaintiff to conclude that her removal was warranted.  Ex. 10 to Def.'s Mot. [Dkt. No. 59-9 at p. 6].  In turn, these disciplinary actions were based in large part on Stowe's accounts of her interactions with Plaintiff, accounts that Plaintiff alleges Stowe fabricated.  Thus, Stowe's accounts were factual predicates for Blocker's decision.

Additionally, it is clear from the entire record that the Proposal to Remove was simply the ultimate step in a series of progressively punitive disciplinary actions, in which each increase in discipline was justified by the prior disciplinary actions.  In other words, Plaintiff alleges that Stowe sought to drive Plaintiff from HUD, by fabricating accounts of misbehavior, and levying progressively harsher discipline on her, with Blocker's proposal simply the final step in this

campaign. If a jury credited Plaintiff's claims, it could reasonably conclude that Stowe's animus was a proximate cause of Blocker's decision.[9]

For these reasons, the Court finds that if a jury credits Plaintiff's allegation that Stowe acted with retaliatory animus, it could also reasonably conclude that Stowe's retaliatory acts were the proximate cause of each of the materially adverse actions that form the basis of her claims.

## IV.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is **denied**.[10]

September 29, 2016

*Gladys Kessler*

Gladys Kessler
United States District Judge

**Copies via ECF to all counsel of record**

---

[9] This inference of proximate cause is further strengthened by evidence of procedural irregularities in Blocker's decision to propose removing Plaintiff. See Walker, 798 F.3d at 1092 ("deviation from established procedures or criteria" may be used to establish an illicit motive). At multiple points in his deposition, Blocker testified that, in formulating the Proposal to Remove, he simply did not consider the Douglas factors at all or that he had already decided to remove Plaintiff, prior to considering the Douglas factors and viewed recitation of the Douglas factors as a mere bureaucratic formality. See Ex. 16 to Pl.'s Corr. Opp'n [Dkt. No. 65-5 at pp. 85-95]. That Blocker did not consider the relevant factors could suggest that the history of prior discipline and Stowe's accounts of Plaintiff's accounts may have played an outsize role in his recommendation.

[10] Given that Plaintiff can survive summary judgment on the theory that she was subject to discrete, materially adverse acts of retaliation, it is unnecessary at this stage to determine whether Plaintiff could also survive summary judgment on the theory that she was subject to a retaliatory hostile work environment. As our Court of Appeals has made clear, these are simply two alternative methods of proving that an employee was retaliated against in violation of 42 U.S.C. § 2000e-3(a). See Baird v. Gotbaum, 662 F.3d 1246, 1250-51 (D.C. Cir. 2011) (holding that a hostile work environment can constitute retaliation in violation of Title VII even where the employee cannot show that the discrete acts of retaliation violated the statute). As Plaintiff can survive summary judgment as to one method, there is no need to determine whether she could also survive summary judgment as to the other.