```
1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2      - - - - - - - - - - - - - - - x
       SANDRA BURTON,
3                                    CA No:  1:12-cv-01537-CRC
                    Plaintiff,
4                                    Washington, D.C.
                                     Monday, July 10, 2017
5      vs.                           9:11 a.m.

6      SHAUN DONOVAN,

7                    Defendant.
       - - - - - - - - - - - - - - - x
8      _____

9           TRANSCRIPT OF JURY TRIAL ~ MORNING SESSION
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
10                 UNITED STATES DISTRICT JUDGE
       _____
11     APPEARANCES:
       For the Plaintiff:      DONALD M. TEMPLE, ESQ.
12                             DONALD M. TEMPLE, P.C.
                               1310 L Street NW, Suite 750
13                             Washington, DC 20005
                               (202) 628-1101
14                             dtemplelaw@gmail.com

15                             THERESA OWUSU, ESQ.
                               THE DGO LAW GROUP, PLLC
16                             1775 I Street, NW, Suite 1150
                               Washington, DC 20006
17                             (202) 587-5680
                               towusu@dgolawgroup.com
18
       For the Defendant:      DAMON WILLIAM TAAFFE, ESQ.
19                             BRIAN J. FIELD, ESQ.
                               U.S. ATTORNEY'S OFFICE FOR D.C.
20                             555 Fourth Street, NW
                               Washington, DC 20530
21                             (202) 252-2544
                               damon.taaffe@usdoj.gov
22     Court Reporter:         Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
23                             U.S. Courthouse, Room 6718
                               333 Constitution Avenue, NW
24                             Washington, DC  20001
                               202-354-3187
25     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription
```

```
1                    P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Your Honor, we're on the
3     record for Civil Case 12-1537, Sandra Burton vs. Shaun
4     Donovan.  Counsel, if you could please approach the lectern
5     and identify yourself for the record.
6              MR. TAAFFE:  Good morning, Your Honor; Damon
7     Taaffe for the defendant.
8              THE COURT:  Mr. Taaffe, how are you?
9              MR. FIELD:  Good morning, Your Honor; Brian Field
10    for the defendant.
11             THE COURT:  Mr. Field.
12             MR. TEMPLE:  Good morning, Your Honor; Donald
13    Temple.
14             THE COURT:  Mr. Temple.
15             MS. OWUSU:  Good morning, Your Honor; Theresa
16    Owusu.
17             THE COURT:  Okay.  I hope everyone had a nice
18    weekend.  And, ma'am, you're Ms. Burton; is that correct?
19             THE PLAINTIFF:  Yes, sir.
20             THE COURT:  Nice to meet you.
21             Okay.  Before we call the jury, I'd like to
22    discuss the Houston evidence issue.
23             MR. TAAFFE:  Your Honor, I'm very sorry to
24    interrupt.  A preliminary thing.  I believe seated in the
25    courtroom is the plaintiff's husband.  Normally I wouldn't
```

 1      protest, but I think he's been named as a witness, and we

 2      would ask that he not sit in light of that fact.

 3              THE COURT:  Mr. Temple, do you intend to call him

 4      as a witness?

 5              MR. TEMPLE:  We do, sir.

 6              THE COURT:  We're going to invoke the rule on

 7      witnesses.

 8              I'm sorry, sir.  You're going to have to leave the

 9      courtroom until the conclusion of the proceedings because

10      you may be a witness in the case.  Nothing personal.

11              MR. TEMPLE:  Your Honor, is it okay to sip coffee?

12              THE COURT:  Of course.  I'm going to do it, so you

13      can do it, too.

14              Okay.  I've reviewed the plaintiff's motion for

15      reconsideration of the Court's oral ruling with respect to

16      Ms. Houston's testimony.  It was filed as a Rule 60(b)

17      motion, but I will construe it as a motion for

18      reconsideration of an interlocutory order under Rule 54(b).

19              Frankly, all of the arguments in the motion with

20      regard to Ms. Houston's testimony, at least, could have been

21      raised in opposition to the motion in limine so there really

22      isn't new evidence.  So technically speaking I don't have to

23      consider the motion, but in the interest of fairness, I

24      spent a fair amount of time this weekend reviewing the

25      additional submissions and have a somewhat better

1   understanding of Ms. Houston's allegations and how they fit

2   into the case.

3          The Court will stand by its prior ruling that she

4   may not testify in the plaintiff's case-in-chief.  The fact

5   remains that she was not listed in the initial disclosures,

6   nor were the disclosures ever supplemented to include her

7   name.

8          Now, it is true that the government was obviously

9   aware of her allegations through both her prior case and

10  through deposition practice in this case, but at the end of

11  the day I continue to believe that the government was

12  entitled to rely on the nondisclosure in the Rule 26(a)(1)

13  context in choosing not to take her deposition, and because

14  her allegations were not tested in discovery in this case,

15  nor were they tested or adjudicated in her own case due to

16  the early settlement, the government would be prejudiced by

17  having to substantively defend at this late stage against a

18  second set of allegations.  And under those circumstances, I

19  think a motion for a continuance would be warranted, and I

20  would be loathe to grant it given the current posture of the

21  case and availability of witnesses, et cetera.

22         And I would just note that this is not just any

23  testimony, right?  It's not testimony about a background

24  fact or, you know, some particular event.  It's testimony

25  offered to prove that Ms. Stowe harbors a retaliatory

1    animus, which is an essential element of the claim.

2          I'm not saying the evidence is not relevant, at

3    least some of it, but simply that it would be unduly

4    prejudicial at this stage in the absence of discovery with

5    respect to her particular allegations.  So the evidence is

6    excluded both under Rule 37(c)(1) and Rule 403.

7          Just as an aside, there was quite a bit of back-

8    and-forth regarding plaintiff's responses to defendant's

9    interrogatories.  Frankly, you know, taken together and

10   viewed in light of the nondisclosure under Rule 26(a)(1), I

11   just don't think they're sufficiently clear taken together

12   to put the government on notice that she would be a trial

13   witness.

14         I think the responses to Interrogatory 7 and

15   Interrogatory 9 are contradictory.  In one says she was --

16   Ms. Houston was subjected to progressive discipline.  The

17   other says that she wasn't.  Interrogatory No. 7, which the

18   plaintiffs rely on, is also, you know, sort of a non

19   sequitur to the question asked.  The question is for, you

20   know, any employees who received lesser discipline.  The

21   answer is that Ms. Houston received progressive discipline,

22   which is sort of a non sequitur to the question that was

23   asked.

24         But for the same reasons, Ms. Houston may not

25   testify as a rebuttal witness on the issue of Ms. Stowe's

1    alleged retaliatory intent as reflected by her own

2    allegations of mistreatment.  If she has rebuttal testimony

3    to offer on some other issue, she'll be treated on equal

4    footing as any other rebuttal witness.

5           Now, that brings us to evidence regarding her --

6    Ms. Houston's -- allegations, which I reserved judgment on

7    at the last pretrial.  I went back and read Judge Kessler's

8    summary judgment ruling.  It's law of the case, and I, in

9    any event, agree with Judge Kessler that Ms. Houston's

10   allegations of similar retaliatory treatment are relevant to

11   the issue of retaliatory animus or a pattern of similar

12   action on Ms. Stowe's part.  Not all of the allegations in

13   Ms. Houston's complaint, but at least those that mirror the

14   allegations here.  So not evidence of her race

15   discrimination claims or her sex, her age, her gender or the

16   allegations about how she was affected or the specific

17   things that Ms. Stowe said to her, but simply the facts that

18   Judge Kessler identified as being similar to the allegations

19   here; namely, that Ms. Houston filed a complaint against a

20   different supervisor, that Ms. Stowe reviewed Ms. Houston's

21   EEO complaint, asked if she had a lawyer, and as a result,

22   their working relationship deteriorated, and Ms. Houston was

23   subjected to some form of discipline.  What form, I'm not

24   really sure.  It doesn't say in the opinion.

25           And so in fairness, I think plaintiff can elicit

1    testimony as to the existence of Ms. Houston's similar

2    allegations without getting into a back-and-forth on the

3    specific facts.  The government should be able to elicit a

4    simple denial from Ms. Stowe -- again, without getting into,

5    you know, an adjudication of the facts here -- and establish

6    that the allegations were resolved without any admission of

7    liability.

8              And we can talk about how that will sort of play

9    out as a practical matter.  I'm happy to give a limiting

10   instruction as to the proper use of or proper consideration

11   of that evidence, but the existence of similar retaliatory

12   allegations I think is relevant and, if we don't get into,

13   you know, a mini trial on the facts here, does not carry the

14   same 403 problems that full testimony on the allegations

15   would.  So just so for purposes of opening, you should know

16   the scope of the Court's ruling today.

17             Anything else before we bring the jury in?

18             MR. TAAFFE:  I had spoken with Mr. Temple last

19   week and just briefly before the Court came in.  There are

20   quite a few exhibits in this case, and I think, in the

21   interest of expediency, we had discussed jointly moving into

22   evidence the joint exhibits outside of the jury's presence

23   so we didn't have to go through all of that during trial.

24             THE COURT:  Music to my ears.

25             MR. TAAFFE:  I just want to make sure that Don is

1   still okay with that.

2              MR. TEMPLE:  Yes.  And, Your Honor, I wanted to

3   apologize.  I mysteriously got sick in a bad way last night.

4              THE COURT:  I'm sorry?

5              MR. TEMPLE:  I got very sick yesterday.

6              THE COURT:  I'm sorry to hear that.

7              MR. TEMPLE:  So I'm trying to accommodate what we

8   need to do notwithstanding that.  We agreed and we spent

9   some time going through them to facilitate that.

10             Given the Court's ruling, though, I wanted to also

11  remind the Court of that exhibit.  It's a letter to the

12  secretary referencing both parties' complaints from the

13  plaintiff.  And the Court had excluded that.  Based on the

14  prior ruling, it seems that that would be admissible based

15  on the Court's reconsideration of it.

16             THE COURT:  Let me look at it again.  You know, I

17  would -- the Court's ruling today considers -- permits

18  eliciting testimony regarding the prior -- Ms. Houston's

19  complaints, which I assume you can get through Ms. Stowe or

20  perhaps through the plaintiff, okay?  I'll take a look at

21  the letter, but what I don't want is allegations that are

22  contained in the letter regarding, you know, race and other

23  issues.  You know, I want to limit this to the retaliatory

24  issues that are present here.

25             MR. TAAFFE:  Just to be formal about it, Your

1   Honor, defendant, I believe jointly with plaintiff, moves

2   for admission of Joint Exhibits 1 through 48.

3          THE COURT:  1 through 48, okay.  So admitted

4   subject to foundation objections.

5          MR. TEMPLE:  And, Your Honor, we would agree.  I

6   just needed -- during the break I told counsel I wanted to

7   just doubly review what they are in the submission to make

8   sure it's what it's purported to be.

9          THE COURT:  That's fine.

10          MR. TEMPLE:  Okay.

11          THE COURT:  That's fine.

12          Just to go over the voir dire again.  We've

13   impaneled 24.  We'll seat the first eight in the box; 1

14   through 4 on the bottom row left to right, 5 through 8 on

15   the top row left to right.  The second eight and the third

16   eight will be in the first two rows of the gallery.

17          We'll give them note cards.  We'll go through the

18   questions, and then we'll do individual voir dire at the

19   bench.  You're welcome to follow up, but limit your follow-

20   up to the scope of the particular question that we're

21   discussing.

22          (Venire enters courtroom)

23          THE COURT:  Okay.  Good morning, ladies and

24   gentlemen.  My name is Casey Cooper, and I will be presiding

25   over this trial.  Thank you in advance for your service

 1     today.  I hope everyone had a nice weekend.

 2             Just to orient you to the courtroom.  For some of

 3     you, this may or may not be your first jury duty experience,

 4     but I'm obviously the judge.

 5             This is our court reporter, Ms. Moreira, who is

 6     taking down everything that we say.

 7             You've met Ms. Jenkins, the courtroom deputy.

 8     This is my law clerk over on the side here.

 9             At the table to your left are the plaintiff in

10     this case and her attorneys, and at the table to your right

11     are the defendant in the case, which is a government agency,

12     and their attorneys.  Okay?

13             So before we get started, I would ask everyone to

14     stand and raise their right hand.

15             (Venire sworn)

16             THE COURT:  Okay.  Ladies and gentlemen, this is

17     a civil lawsuit brought by the plaintiff in the case,

18     Ms. Sandra Burton.  And you will meet her in a minute.

19     Ms. Burton is a former employee of the Department of Housing

20     and Urban Development in its office of the chief procurement

21     officer.  Okay?  And we'll refer to the Department of

22     Housing and Urban Development as HUD.

23             Ms. Burton has brought this case claiming that HUD

24     retaliated against her because she complained about

25     discrimination by a former supervisor and filed charges of

1    discrimination against HUD with the Equal Employment

2    Opportunity Commission.  Ms. Burton specifically claims that

3    HUD retaliated against her by suspending her on multiple

4    occasions and forcing her to resign and by creating a

5    hostile work environment.

6            HUD denies these allegations.  It maintains that

7    the actions it took against Ms. Burton were for legitimate,

8    nondiscriminatory reasons and were not in retaliation

9    against her.

10           Okay.  You each should have a note card.  Please

11   write your juror number in the upper right-hand corner of

12   the card.  And I'm going to -- yes, sir.

13           PROSPECTIVE JUROR:  We're short one.

14           THE COURT:  We need one more card, Ms. Jenkins.

15           PROSPECTIVE JUROR:  Sorry.  Thank you.

16           THE COURT:  And I'm going to ask you a series of

17   about, I think, 24 questions.  If your answer to any

18   question is yes, write the number of the question on your

19   card.  Don't write "yes" or "no," but if the answer to the

20   question is yes, please write the number of the question on

21   your card.

22           And if you have any questions about what I'm

23   asking you, just raise your hand, and I will try to clarify

24   it for you.

25           Okay.  The first question is, do you have any

 1   knowledge about the events that I just described, the events

 2   regarding the lawsuit that Ms. Burton has filed?  If you

 3   have any knowledge about her allegations, please write the

 4   number 1 on your card.

 5           Question 2:  Do you know or have any personal

 6   familiarity with any of the parties to this action:

 7   Ms. Burton or the Department of Housing and Urban

 8   Development?

 9           And Ms. Burton, I'd ask for you to stand up,

10   please.  Thank you, ma'am.

11           MS. BURTON:  I just recently had back surgery so

12   I'm slow.

13           THE COURT:  That's okay.

14           So any personal familiarity with Ms. Burton or

15   with HUD, please write 2 on your card.

16           I'll now ask the attorneys in the case to

17   introduce themselves.  If you have any -- if you know any of

18   the attorneys in the case, please write 3 on your card.

19           Why don't we start with the plaintiff.

20           MS. OWUSU:  Theresa Owusu.

21           MR. TEMPLE:  Good morning; Donald Temple.

22           MR. TAAFFE:  Good morning; Damon Taaffe.

23           MR. FIELD:  Good morning; Brian Field.

24           MS. DREW:  Good morning; Nicole Drew.

25           THE COURT:  Okay.  If you know any of the

1    attorneys or if you know me, write 3 on your card.

2              Okay.  Question 4.  I want you all to look around

3    and see if you know any of your fellow potential jurors.  If

4    any of you know one another, please write 4 on your card.

5              Okay.  I'm now going to read a list of names, and

6    these are the names of people who may appear as witnesses in

7    this case.  They may or may not, but there's a possibility

8    that they will appear as witnesses in this case.  So in

9    addition to Ms. Burton, who you've met, those people are

10   Keith Burton, Elie Stowe, S-t-o-w-e, Jemine Bryon, B-r-y-

11   o-n, Lorraine Smith, David Blocker, Gerald Fairbanks, Kevin

12   Stutzman, Priscilla Lewis, Sylvia Brown, Sandy Krems, Keith

13   Surber, Tonya Houston.  Okay?

14             If you know any of those folks or think you know

15   any of those folks -- I know some of the names are a little

16   generic -- write down the No. 5 and put the person --

17   indicate the person who you think you might know.  Is that

18   clear?

19             Question 6:  Have you, or any of your family or

20   any of your close friends, ever been employed by HUD?  And

21   when I say "any of your family," that means family close

22   enough that might affect your opinions or perception of HUD,

23   okay?  So it's not your second cousin in Wisconsin, but it's

24   close family members or family members who you are in

25   contact with enough so that they might affect your

14

1    perception of HUD, okay?  And there will be a series of

2    questions along these lines.  So No. 6, if you or any of

3    your family or close friends have been employed by HUD.

4           No. 7:  Have you ever had any negative experiences

5    with HUD or any other experiences that would cause you to

6    view HUD unfavorably in this case?  If so, write 7 on your

7    card.

8           No. 8:  Do you, either because of your job or for

9    any other reason, come into regular contact with HUD?

10   Regular contact with HUD, please write 8 on your card.

11          No. 9:  Have you or any close friend or relative

12   ever been a defendant in a lawsuit or had a legal claim of

13   any kind filed against you?  Defendant in a lawsuit, or if

14   you've had or any of your close family members or relatives

15   have had a legal claim filed against them, please write 9 on

16   your card.

17          No. 10:  Have you or any close friend or relative

18   ever been the subject of a workplace complaint of harassment

19   or retaliation?

20          No. 11:  Have you or any close friend or relative

21   ever made a complaint of discrimination, harassment, or

22   retaliation against an employer?

23          No. 12:  If so -- so if you answered yes to

24   Question 11, have you, any close friend or relative, ever

25   been fired or denied a promotion or experienced any other

1    adverse employment action after complaining of harassment or

2    retaliation or discrimination in the workplace?

3            No. 13:  Have you ever worked in an environment

4    that you considered to be hostile for one reason or another?

5    Have you ever worked in a work environment that you

6    considered to be hostile in one form or another?

7            No. 14:  To your knowledge, has your employer ever

8    been sued for discrimination or harassment?

9            No. 15:  Is there any reason why you would give

10   more weight to the testimony of a supervisor, manager, or

11   senior official in a case like this simply because he or she

12   is more senior, or is there any reason why you would give

13   more weight to the testimony of a nonsupervisory or

14   nonmanagement-level employee simply because that employee is

15   more junior?  So the question is, is there any reason that

16   you would give more weight to a senior employee or a junior

17   employee in a case like this?  If the answer is yes, please

18   write 15 on your card.

19           No. 16:  Have you ever received any training in

20   the area of workplace antidiscrimination laws?

21           No. 17:  Have you, or any close friend or

22   relative, ever been a witness for the plaintiff or for the

23   defense in a civil case?

24           No. 18:  Have you previously served on a grand

25   jury or a trial jury in a criminal or civil case in either

1       state or federal court?  So, in other words, any prior jury

2       service of any kind, please write 18 on your card.

3              No. 19:  Do you have any legal training, or have

4       you ever worked in the legal profession?  Any legal training

5       or prior work experience in the legal profession?  If so,

6       write 19.

7              No. 20:  Do you have a hearing problem that would

8       make it difficult for you to comprehend oral testimony, or

9       limited vision, or any other medical condition that would

10      make it difficult for you to read or hear or concentrate on

11      the evidence in this case?  If so, write 20.

12             21:  Are you presently taking any medication that

13      might cause drowsiness, or are you experiencing any other

14      physical or mental conditions that might affect your ability

15      to give your full attention to this case?  If so, please

16      indicate 21.

17             Question 22:  Do you have difficulty understanding

18      the English language?  If so, write 22.

19             Now, it is difficult sometimes to predict how long

20      a trial will last, but based on what the parties have told

21      me, I expect the evidence in the case to last probably

22      throughout this week.  Thereafter, it is up to the jury to

23      determine how long their deliberations might be.  Given that

24      predicted schedule, do you believe that serving as a juror

25      on this case would constitute an extreme hardship?

1          And when I say "extreme hardship," I say that

2     recognizing that everyone, to some extent, is inconvenienced

3     by jury service.  An extreme hardship goes beyond that.  And

4     in answering the question, I will tell you that if you

5     answer yes, your name will go back into the pool, and you

6     will be called in the near future, okay?  So you will be

7     recalled to another trial even if you answer extreme

8     hardship.  Okay?

9          Question 24:  Do you know of any other reason I

10    have not mentioned that would make you unable to sit and

11    hear this case and render a fair and impartial verdict?  Any

12    other reason why you think you may not be able to render an

13    impartial verdict in this case?  If so, write 24 on your

14    card.

15         Any questions?  All right.

16         Ms. Jenkins, do you want to collect the cards?

17         (Pause)

18         THE COURT:  Okay.  Ladies and gentlemen, the next

19    step is I will review your answers, and we will have each

20    one of you up to the bench in the order that you were

21    brought into the courtroom, and I'll ask some follow-up

22    questions about your answers and give the attorneys on

23    either side a chance to briefly ask a few follow-up

24    questions as well.  So we'll do that one at a time.

25         If you are in the third row, I will let you go for

1    the time being, but please do not discuss the case.  I know

2    it's tempting to call home and say what kind of case you've

3    been assigned to.  Please resist that temptation.  Don't

4    discuss anything with your fellow jurors, but you should

5    feel free to, you know, go to the cafeteria or take a walk

6    outside, and why don't you come back at 11:00, okay?  And

7    we'll work through the first two groups, and then we'll work

8    through you guys when you come back.

9            And I should also say, not only do not discuss the

10   case, but no independent research about the case, so no

11   Internet access or anything like that, okay?

12           And for those of you who aren't called up to the

13   bench, feel free to read the paper or relax.  And if you

14   need to go out to the bathroom or anything, just raise your

15   hand, and let us know.

16           (Pause)

17           (The following is a conference held at the

18            bench outside the hearing of the gallery)

19           THE COURT:  Okay.  Juror 1039.

20           So the husher is on so we can hear each other.  I

21   will ask counsel to speak into the mic so that the Court

22   reporter can pick it up.

23           How are you this morning?

24           PROSPECTIVE JUROR:  Doing all right.  How about

25   you?

1          THE COURT:  Good.  Thanks for your service.  How

2     was your weekend?

3          PROSPECTIVE JUROR:  Good.

4          THE COURT:  So you are an executive assistant at

5     Dynamis.  Tell us what that is.

6          PROSPECTIVE JUROR:  It's a government contracting

7     company.

8          THE COURT:  What kind of contracting does it do?

9          PROSPECTIVE JUROR:  Mostly defense contracts.

10          THE COURT:  And so your clients are DOD and other

11     agencies?

12          PROSPECTIVE JUROR:  I support DHS.

13          THE COURT:  DHS, okay.  How long have you been

14     there?

15          PROSPECTIVE JUROR:  I've been with Dynamis about

16     two years this summer.

17          THE COURT:  What did you do before then?

18          PROSPECTIVE JUROR:  I was unemployed, college.

19          THE COURT:  Where did you go to college?

20          PROSPECTIVE JUROR:  George Mason University.

21          THE COURT:  What did you study?

22          PROSPECTIVE JUROR:  Government and international

23     politics.

24          THE COURT:  Where are you from?

25          PROSPECTIVE JUROR:  Richmond, Virginia.

1          THE COURT:  Do you like D.C.?

2          PROSPECTIVE JUROR:  I do.

3          THE COURT:  Now, you did not answer -- I'm sorry,

4     what did you major in?

5          PROSPECTIVE JUROR:  Government and international

6     politics.

7          THE COURT:  No contracts with HUD, I take it?

8          PROSPECTIVE JUROR:  None with HUD that I'm aware

9     of.

10         THE COURT:  Now, you did not answer yes to any of

11    the questions.  You understood the questions, I take it.

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  You just didn't have any answers?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  Mr. Temple.

16         MR. TEMPLE:  I just have one.  Any contract

17    work -- have you had any involvement with the DHS Office of

18    Inspector General?

19         PROSPECTIVE JUROR:  I think I've probably answered

20    the phone for my boss who has had a call, but, you know --

21    or something like that, but I haven't interacted with them.

22         THE COURT:  Mr. Taaffe?

23         MR. TAAFFE:  No questions.

24         THE COURT:  Okay.  Thank you, ma'am.  You can have

25    a seat.

```
1              Okay.  Any challenges to Ms. Field?

2              MR. TEMPLE:  No, sir.

3              THE COURT:  Okay.  She's qualified.

4              Juror 1692.

5              Mr. Nelson.

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Good to see you.  Thanks for your

8    service.

9              PROSPECTIVE JUROR:  Thank you.

10             THE COURT:  So you're a postal worker?

11             PROSPECTIVE JUROR:  Yes, sir.

12             THE COURT:  How long have you been doing that?

13             PROSPECTIVE JUROR:  39 years.

14             THE COURT:  I would ask you what you did before

15   that, but I don't think I need to.  You work in D.C.?

16             PROSPECTIVE JUROR:  Yes, sir.

17             THE COURT:  Where did you go to school?

18             PROSPECTIVE JUROR:  McKinley Tech.

19             THE COURT:  Okay.  You answered yes to four

20   questions.

21             Question 11, you or a close friend or relative

22   made a complaint of discrimination.  Why did you answer yes

23   to that question?

24             PROSPECTIVE JUROR:  I filed a complaint with my

25   employer.
```

1          THE COURT:  I'm sorry, could you speak up a little

2    bit?

3          PROSPECTIVE JUROR:  Yes.  I filed a discrimination

4    complaint against my employer.

5          THE COURT:  Against the Postal Service?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  How long ago was that?

8          PROSPECTIVE JUROR:  Oh, 15, 20 years ago.

9          THE COURT:  20 years ago.  And what was the nature

10   of the discrimination that you alleged?

11         PROSPECTIVE JUROR:  It was a disciplinary action.

12         THE COURT:  And why did you believe that you were

13   discriminated against?

14         PROSPECTIVE JUROR:  My supervisor treated me

15   unfairly in that matter.

16         THE COURT:  Did you allege that he discriminated

17   against you because of your race or your age or your gender?

18   What was the basis of your claim?

19         PROSPECTIVE JUROR:  Race.

20         THE COURT:  And he was white?  She was white?

21         PROSPECTIVE JUROR:  She was black.

22         THE COURT:  She was black.

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  How was that claim resolved?

25         PROSPECTIVE JUROR:  It was settled before it went

```
1       to trial.

2               THE COURT:  But you remain with the Postal

3       Service?

4               PROSPECTIVE JUROR:  Yes.

5               THE COURT:  Have you filed any similar complaints

6       over the last 15 years?

7               PROSPECTIVE JUROR:  No.

8               THE COURT:  You're happy with your job?

9               PROSPECTIVE JUROR:  Yes.

10              THE COURT:  No. 13, have you ever worked in an

11      environment that you considered to be hostile for one reason

12      or the other?  You answered yes.

13              PROSPECTIVE JUROR:  Well, with the Postal Service

14      there's a phrase called "going postal," and it's usually

15      because they say that the Postal Service has a hostile

16      environment.

17              THE COURT:  So that relates to postal workers who

18      have done something violent or criminal on the job?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  And does your answer to that question

21      relate to the discrimination allegations that you filed --

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  -- or it's completely unrelated to

24      that?

25              PROSPECTIVE JUROR:  No, no.
```

1          THE COURT:  You answered that your employer has

2    been sued for discrimination or harassment.

3          PROSPECTIVE JUROR:  Yes.  That's common knowledge.

4          THE COURT:  And finally, you have prior jury

5    service.

6          PROSPECTIVE JUROR:  Yes, D.C. Superior Court.

7          THE COURT:  How many times?

8          PROSPECTIVE JUROR:  Twice.

9          THE COURT:  When was the first time approximately?

10          PROSPECTIVE JUROR:  My early 20s.  I'm 60 now.

11          THE COURT:  Do you remember what kind of case it

12    was?

13          PROSPECTIVE JUROR:  It was so long ago.  It was a

14    robbery case.

15          THE COURT:  A criminal case?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  What was the verdict?  Did you reach a

18    verdict?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  What was the verdict?

21          PROSPECTIVE JUROR:  Guilty.

22          THE COURT:  Did you serve as the foreman in that

23    case?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Anything about the deliberations or

1    your experience in that case that would make you uneasy or

2    uncomfortable serving on a jury in a case like this?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  What's the second time?

5              PROSPECTIVE JUROR:  The second time was the same

6    thing, robbery.

7              THE COURT:  Same question.  Did you all

8    deliberate?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Reach a verdict?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Hung jury?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Okay.  Acrimonious?

15             PROSPECTIVE JUROR:  I beg your pardon?

16             THE COURT:  Was there a lot of conflict and

17   tension in the jury room?

18             PROSPECTIVE JUROR:  Yes, there was.

19             THE COURT:  Same question.  Did that experience or

20   would that experience affect your ability to want to serve

21   on a jury again?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Mr. Temple.

24             MR. TEMPLE:  Given your experience at the Postal

25   Service, Post Office, both in terms of bringing a complaint

1    and what you consider to be claims of hostile workplace

2    environment, do you think that you could actually hear a

3    case where some similar issues of retaliation might be

4    alleged and be fair and impartial?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Mr. Taaffe?

7              MR. TAAFFE:  Do you feel that after you filed your

8    complaint against the Postal Service that settled, that you

9    were treated any differently after in your work at the

10   Postal Service?

11             PROSPECTIVE JUROR:  No.

12             MR. TEMPLE:  I'm sorry, I couldn't hear the last

13   part of that question.

14             THE COURT:  The question was whether, after his

15   complaint, did he feel that he was treated any differently

16   by the Postal Service; and the answer was no.

17             Anything else?

18             Okay.  Thank you, sir.  Please go back to your

19   seat.

20             Mr. Taaffe?

21             MR. TAAFFE:  I think he's just a little bit too

22   close, Your Honor.

23             THE COURT:  Speak up.

24             MR. TAAFFE:  I think it's just a little too close

25   to the facts here; a race discrimination complaint exactly

```
 1    like this against a supervisor like this was settled like

 2    this.  I think it would be hard to disentangle his personal

 3    experience on that front.

 4                THE COURT:  I'll overrule the objection.  It was

 5    15 years ago.  It's not discrimination; it's retaliation.

 6    And he said he could be fair, and he struck me as being a

 7    pretty straight-up guy; so he's qualified.

 8                1306.

 9                Good morning, Mr. Knapp.

10                PROSPECTIVE JUROR:  Good morning.

11                THE COURT:  How are you?

12                PROSPECTIVE JUROR:  Good.  How are you?

13                THE COURT:  How was your weekend?

14                PROSPECTIVE JUROR:  Busy.

15                THE COURT:  Busy, okay.

16                So you're an engineer with WDP & Associates

17    Consulting.  Tell me what that is and what you do.

18                PROSPECTIVE JUROR:  I'm a civil structural

19    engineer.  We work on mostly existing buildings in that

20    we -- for example, if the roof leaks, we would repair

21    something like that.  We can work with design plans, and a

22    lot of times we also monitor construction.

23                THE COURT:  Keep your voice up just a little bit,

24    please.

25                PROSPECTIVE JUROR:  We also monitor construction.
```

1    Often we get into nondestructive testing.  We do work on

2    some federal buildings in D.C., things like that.

3              I mentioned my weekend was busy.  I am a landlord

4    as well.

5              THE COURT:  You're a...?

6              PROSPECTIVE JUROR:  A landlord.

7              THE COURT:  So your work is mostly commercial

8    office buildings?

9              PROSPECTIVE JUROR:  You could say that.  We work

10   for a number of colleges, universities, post-secondary

11   education centers as well.

12             THE COURT:  How big of a company is it?  How many

13   employees?

14             PROSPECTIVE JUROR:  I would say maybe 50 technical

15   staff.  All the rest are support staff to accompany that.

16   So engineers and architects, probably 50.

17             THE COURT:  And you have federal contracts?

18             PROSPECTIVE JUROR:  Not standing contracts.  Kind

19   of on a project-by-project basis.

20             THE COURT:  Do you have any ongoing projects with

21   HUD?

22             PROSPECTIVE JUROR:  Not with HUD, no.

23             THE COURT:  Any prior projects with HUD?

24             PROSPECTIVE JUROR:  Not to my knowledge.

25             THE COURT:  Where are you from.

```
 1              PROSPECTIVE JUROR:  Florida, originally.  I've
 2    bounced around a bit though.
 3              THE COURT:  How long have you been with WDP?
 4              PROSPECTIVE JUROR:  Let's see, about a year and a
 5    half.
 6              THE COURT:  What did you do before then?
 7              PROSPECTIVE JUROR:  Another engineering firm.
 8              THE COURT:  Which one?
 9              PROSPECTIVE JUROR:  T.Y. Lin International.
10              THE COURT:  Spell that.
11              PROSPECTIVE JUROR:  T.Y. L-i-n International.
12              THE COURT:  Doing similar things?
13              PROSPECTIVE JUROR:  That was more bridge
14    engineering.
15              THE COURT:  Where did you go to school?
16              PROSPECTIVE JUROR:  University of Florida, and
17    then Georgia Tech in Atlanta.
18              THE COURT:  So you did not answer yes to any of
19    the questions.  You obviously understood the questions,
20    right?
21              PROSPECTIVE JUROR:  Correct.
22              THE COURT:  You just didn't have any affirmative
23    answers?
24              PROSPECTIVE JUROR:  Correct.
25              THE COURT:  Mr. Temple.
```

1          MR. TEMPLE:  Regarding your answers and what the

2     Court has instructed you about the case, do you think you

3     could be fair and impartial?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  All right.

6          MR. TAAFFE:  No questions.

7          THE COURT:  Okay.  Thank you, sir.

8          Any challenges to Mr. Knapp?

9          MR. TEMPLE:  No, sir.

10          THE COURT:  Okay.  He's qualified.

11          Okay.  Juror 1734.

12          Good morning, Mr. Pollak.

13          PROSPECTIVE JUROR:  Good morning.

14          THE COURT:  How are you?

15          PROSPECTIVE JUROR:  Good.  How are you?

16          THE COURT:  You are the head of global affairs for

17     something called Global Affairs?

18          PROSPECTIVE JUROR:  For 1776.  It's a start-up

19     incubator and venture fund.

20          THE COURT:  Focusing on particular --

21          PROSPECTIVE JUROR:  Start-ups that are in highly

22     regulated sectors that are generally, you know, focused on

23     government.

24          THE COURT:  Give me an example of a couple of

25     your -- the companies that you've funded.

1          PROSPECTIVE JUROR:  So we funded over 30

2     companies.  We work with 2,000 around the world that are in

3     sectors like transportation, healthcare, education, energy.

4     Ones that generally have to deal with a significant amount

5     of regulation.

6          THE COURT:  Okay.  How large is your company?

7          PROSPECTIVE JUROR:  We have 30 employees based

8     here in Washington, D.C.; in Crystal City, Virginia;

9     Brooklyn, New York; and Dubai.

10          THE COURT:  So what does the head of global

11     affairs do?  That's a pretty broad topic.

12          PROSPECTIVE JUROR:  Yes.  So my job has been

13     engagement with government, mayors, governors, members of

14     Congress, administration, foreign governments, all around

15     their kind of innovation agendas and various public policies

16     related to start-ups around venture capital or various

17     policy issues in different sectors.

18          THE COURT:  How long have you been there?

19          PROSPECTIVE JUROR:  So I joined full time about

20     three and a half years ago, but I'm one of the co-founders

21     of the company.

22          THE COURT:  What did you do before?

23          PROSPECTIVE JUROR:  I was a lobbyist.

24          THE COURT:  On what issues generally?

25          PROSPECTIVE JUROR:  So I focused mainly on

1    technology innovation, privacy issues, immigration,

2    transportation.

3              THE COURT:  Were you with an association or --

4              PROSPECTIVE JUROR:  So I was at a private firm at

5    a law firm, and our clients were usually Fortune 500 or

6    trade associations.

7              THE COURT:  Which firm?

8              PROSPECTIVE JUROR:  Bryan Cave.

9              THE COURT:  In your current job, do you have any

10   HR responsibilities?

11             PROSPECTIVE JUROR:  I do not.

12             THE COURT:  Okay.  You answered yes to 2, 19, and

13   20.  So you have some familiarity with Ms. Burton or with

14   HUD?

15             PROSPECTIVE JUROR:  So with HUD specifically, not

16   Ms. Burton.

17             But with HUD I advised the previous secretary and

18   some of his senior staff on their strategies around

19   engagement and start-ups, so that's why I listed No. 2.  And

20   I had Secretary Castro, the former secretary, speak at one

21   of my events that I put together.

22             THE COURT:  Legal training?

23             PROSPECTIVE JUROR:  Well, I interned -- well, I

24   answered that question because I interned at a law firm back

25   in Michigan while I was in college conducting research and

```
 1    filing briefings in court.

 2              THE COURT:  Okay.  And hearing or vision issues?

 3              PROSPECTIVE JUROR:  Yes.  So I have -- was

 4    diagnosed with severe hearing loss in both ears.  Last year

 5    I had surgery on my right ear to relieve some of that

 6    hearing loss.  I have not had surgery on my left ear yet,

 7    though it's an option available to me.  So I still have a

 8    hearing imbalance.

 9              THE COURT:  So just sitting here today were you

10    able to hear and comprehend?

11              PROSPECTIVE JUROR:  Most of what I heard, yes.

12    Sometimes left ear, it's choppier low; and right ear I hear

13    better.

14              THE COURT:  But does that inhibit your ability to

15    function at your job?

16              PROSPECTIVE JUROR:  No.

17              THE COURT:  What caused it?

18              PROSPECTIVE JUROR:  So it's a long name that I

19    often forget.

20              THE COURT:  That's all right.

21              PROSPECTIVE JUROR:  So I don't have nerve damage,

22    but one that is treatable.

23              THE COURT:  So straight up, would you be

24    comfortable sitting if you were selected?

25              PROSPECTIVE JUROR:  If I were selected, I still
```

1     could probably hear.

2                THE COURT:  Okay.  Mr. Temple.

3                MR. TEMPLE:  While you indicated that you don't

4     actually -- you're not involved in personnel matters, you're

5     the CEO for the company.

6                PROSPECTIVE JUROR:  Not the CEO.  I'm one of the

7     co-founders, but I'm not the CEO.

8                MR. TEMPLE:  So what's your position?

9                PROSPECTIVE JUROR:  So it's head of global

10    affairs.  I have obviously interviewed junior staff for

11    positions within our company.  I do have a leadership

12    position at the company, but I'm not the CEO.

13               MR. TEMPLE:  Are you involved in that leadership

14    position in any disciplinary-type of actions, including

15    termination for any of your employees?

16               PROSPECTIVE JUROR:  Yes.  I've been brought in to

17    meetings and conversations around terminations with people.

18               MR. TEMPLE:  And as to the decision-making, are

19    you making recommendations, or are you actually a decision-

20    maker in that process?

21               PROSPECTIVE JUROR:  So I make recommendations.

22    Ultimately it's up to the CEO to make a final decision.

23               MR. TEMPLE:  And if I may, as to HUD, you

24    indicated that you are in some type of contractual

25    relationship.  How many years was that?

1          PROSPECTIVE JUROR:  So it wasn't a contractual

2     relationship.  It was an informal advising, meeting with

3     staff on a number of occasions, including the former

4     Secretary Castro, around how they could be engaging with

5     start-ups around the U.S., and so it's really around that

6     element.

7          MR. TEMPLE:  Would that prevent you in any way

8     from being fair and impartial given that HUD is a party

9     defendant here?

10          PROSPECTIVE JUROR:  No.

11          MR. TEMPLE:  Thank you.

12          THE COURT:  Mr. Taaffe?

13          MR. TAAFFE:  Good morning.  Did you work at all

14     with former Secretary Donovan, or was it just former

15     Secretary Castro?

16          PROSPECTIVE JUROR:  Just Castro.

17          MR. TAAFFE:  No other questions.

18          THE COURT:  Okay.  Thank you, sir.

19          Okay.  Any challenge for cause of Mr. Pollak?

20          MR. TEMPLE:  No, sir.

21          MR. TAAFFE:  No.

22          THE COURT:  Okay.  He's qualified.

23          Okay.  Juror 1331, please.

24          Good morning, Ms. Thomas.

25          PROSPECTIVE JUROR:  Good morning.

1                    THE COURT:  How are you.

2                    PROSPECTIVE JUROR:  I'm good.

3                    THE COURT:  Thank you for your service.

4                    So you're unemployed at the moment; is that

5        correct?

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  Where have you worked previously?

8                    PROSPECTIVE JUROR:  Law firms and nonprofits.

9                    THE COURT:  Speak up just a little bit.  We have

10       the husher on so no one can hear you.

11                   PROSPECTIVE JUROR:  Nonprofits and a couple of law

12       firms.

13                   THE COURT:  Okay.  Which law firms?

14                   PROSPECTIVE JUROR:  Sharp & Associates.

15                   THE COURT:  One more time.

16                   PROSPECTIVE JUROR:  Sharp & Associates.

17                   THE COURT:  What kind of law did they practice?

18                   PROSPECTIVE JUROR:  Criminal defense.

19                   THE COURT:  And any others?

20                   PROSPECTIVE JUROR:  That's the only law firm, and

21       the Architect of the Capitol.

22                   THE COURT:  Architect of the Capitol.  And what

23       did you do at the law firm?

24                   PROSPECTIVE JUROR:  I was assistant to the

25       partner.

```
1                  THE COURT:  So you were an executive assistant?

2                  PROSPECTIVE JUROR:  Uh-huh.

3                  THE COURT:  What about at the Office of the

4       Architect?

5                  PROSPECTIVE JUROR:  I was a law clerk.

6                  THE COURT:  Law clerk.  Do you have legal

7       training?

8                  PROSPECTIVE JUROR:  A little bit.  I got my

9       graduate degree in criminal justice so I studied law there.

10                  THE COURT:  Great.  Are you from Washington?

11                  PROSPECTIVE JUROR:  I am.

12                  THE COURT:  Where did you go to school?

13                  PROSPECTIVE JUROR:  High school, School Without

14       Walls.

15                  THE COURT:  School Without Walls?

16                  PROSPECTIVE JUROR:  Uh-huh.  Shaw Junior High and

17       Park View Elementary.

18                  THE COURT:  You answered yes to 9, 18, and 19.

19       No. 9 is have you or any close friend or relative ever been

20       a defendant in a lawsuit or had a legal claim filed against

21       you.  Tell us about that.

22                  PROSPECTIVE JUROR:  I served as an advisory

23       neighborhood commissioner, an ANC commissioner, and I was

24       sued by one of my constituents involving a liquor license.

25                  THE COURT:  What neighborhood?
```

```
1              PROSPECTIVE JUROR:  Georgia Avenue-Petworth.

2              THE COURT:  That's Ward 4?

3              PROSPECTIVE JUROR:  1.

4              THE COURT:  Ward 1.  How was that resolved?

5              PROSPECTIVE JUROR:  A D.C. attorney took it to

6      court, and it ended up being resolved.

7              THE COURT:  So were you found liable in any way?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  No. 18, prior jury service?

10             PROSPECTIVE JUROR:  Yes.  I served four or five

11     times in D.C. Superior Court.

12             THE COURT:  Okay.  When was the last time you

13     served?

14             PROSPECTIVE JUROR:  Last summer.

15             THE COURT:  What kind of case?

16             PROSPECTIVE JUROR:  A gun possession case,

17     criminal case.

18             THE COURT:  Did you reach a verdict?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  What was the verdict?

21             PROSPECTIVE JUROR:  Guilty.

22             THE COURT:  And the other four, criminal or civil?

23     All criminal?

24             PROSPECTIVE JUROR:  They were all criminal.

25             THE COURT:  Okay.  Did the juries reach verdicts
```

1     in all of those cases?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Were there any acquittals?

4              PROSPECTIVE JUROR:  I don't believe so.

5              THE COURT:  Were you the foreperson in any of

6     those juries?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Anything about those experiences make

9     you not want to serve on a jury again?

10             PROSPECTIVE JUROR:  No.  They were positive.

11             THE COURT:  Okay.  All right.  I asked you the

12    question about legal training.  That was the last one.

13             Okay.  Mr. Temple.

14             MR. TEMPLE:  Yes.  When you worked in the law

15    firm, were you involved at all -- was that one law firm or

16    two law firms?

17             PROSPECTIVE JUROR:  It was one firm.

18             MR. TEMPLE:  Okay.  And did you do any civil

19    litigation at all?

20             PROSPECTIVE JUROR:  No.  It was a criminal defense

21    firm.

22             MR. TEMPLE:  And you indicated that you had a

23    number of jobs before this, before now.  Have you ever been

24    in a situation where you were terminated or disciplined at

25    any of those jobs?

```
 1              PROSPECTIVE JUROR:  No.

 2              MR. TEMPLE:  And where did you go to college?

 3              PROSPECTIVE JUROR:  Trinity University.  Do you

 4     need graduate school?

 5              MR. TEMPLE:  No.

 6              PROSPECTIVE JUROR:  Okay.

 7              MR. TEMPLE:  Thank you.

 8              THE COURT:  Mr. Taaffe?

 9              MR. TAAFFE:  You said you worked at the Architect

10     of the Capitol --

11              PROSPECTIVE JUROR:  Yes.

12              MR. TAAFFE:  -- as a law assistant, law clerk of

13     some sort?

14              PROSPECTIVE JUROR:  Uh-huh.

15              MR. TAAFFE:  What were your duties in that role?

16              PROSPECTIVE JUROR:  We drafted some -- what are

17     they called? -- it was in labor law, so it was a bargaining

18     agreement, so I worked on that most of the time I was there.

19              THE COURT:  With respect to that experience, were

20     you involved in any personnel-related disputes with the

21     Architect of the Capitol or lawsuits that were filed against

22     it?

23              PROSPECTIVE JUROR:  Oh, no.  I focused mostly --

24     during that time I was there, we were drafting the

25     bargaining agreement, so that's what I worked on the
```

1   majority of the time.

2              THE COURT:  Anything else?

3              MR. TAAFFE:  Just one follow up.

4              In the labor capacity, did you directly or did you

5   work with anyone who was advising people who took -- made

6   use of the grievance process?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Anything else?

9              MR. TEMPLE:  I'm sorry.  You did say you went to

10  graduate school.

11             PROSPECTIVE JUROR:  Yes.

12             MR. TEMPLE:  And I would be interested in what you

13  studied in graduate school.

14             PROSPECTIVE JUROR:  Criminal justice.

15             MR. TEMPLE:  Thank you.

16             THE COURT:  Thank you, ma'am.

17             PROSPECTIVE JUROR:  Thank you.

18             THE COURT:  I'm sorry it's so tight, but just keep

19  your voices up.

20             Okay.  Any challenge to Ms. Thomas?

21             MR. TEMPLE:  No, sir.

22             MR. TAAFFE:  No.

23             THE COURT:  Okay.  She's qualified.

24             372, please.

25             PROSPECTIVE JUROR:  Good morning.

1          THE COURT:  Good morning, ma'am.

2          PROSPECTIVE JUROR:  Hi.

3          THE COURT:  How are you?

4          PROSPECTIVE JUROR:  Fine.

5          THE COURT:  Thanks for coming down.

6          PROSPECTIVE JUROR:  Okay.

7          THE COURT:  So you work in customer service at

8    Pepco?

9          PROSPECTIVE JUROR:  I do.

10          THE COURT:  How long have you done that?

11          PROSPECTIVE JUROR:  Around 37 years.

12          THE COURT:  Wow.  A lot of changes over time.

13          PROSPECTIVE JUROR:  Yes.  Some changes, yes.

14          THE COURT:  Uh-huh.  Is the customer service

15    better than it was 38 years ago?

16          PROSPECTIVE JUROR:  I would say yes.

17          THE COURT:  Good.

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Are you from Washington originally?

20          PROSPECTIVE JUROR:  Yes, I am.

21          THE COURT:  Grew up here?

22          PROSPECTIVE JUROR:  All my life, yes.

23          THE COURT:  Whereabout?

24          PROSPECTIVE JUROR:  Southeast, Eastern Market.

25          THE COURT:  Uh-huh.  Where did you go to school?

1              PROSPECTIVE JUROR:  Watkins, Hines Junior High

2      School, and Burdick Vocational.

3              THE COURT:  You answered yes to Question 18.  You

4      have prior jury experience.  If you've been in D.C. for 38

5      years, I bet you've had a lot of prior jury experience.

6              PROSPECTIVE JUROR:  I don't know about a lot, but

7      I have some.

8              THE COURT:  How many times would you say?

9              PROSPECTIVE JUROR:  I've been in this courtroom

10     probably maybe 15 years ago, I don't know.  Or this court, I

11     should say.

12              I've been down at grand jury about seven, eight

13     years ago.

14              THE COURT:  Uh-huh.

15              PROSPECTIVE JUROR:  And I've been to the one

16     across the street probably every two years just about.

17              THE COURT:  The case here, what did it involve?

18              PROSPECTIVE JUROR:  It was a civil case.  Oh, the

19     one here?

20              THE COURT:  Yes, federal court.

21              PROSPECTIVE JUROR:  I do not remember.  I was

22     trying to think about it.  I do not remember.  It's been a

23     while.

24              THE COURT:  Did you reach a verdict?

25              PROSPECTIVE JUROR:  We did.

1          THE COURT:  Uh-huh.  And was it a plaintiff's

2     verdict or a defense verdict?  Do you remember?

3          PROSPECTIVE JUROR:  I do not remember, sir.  I do

4     not remember.  I do not.  It's been a long time.

5          THE COURT:  All right.  Now, is that because you

6     tried to block it out of your mind because it was such a

7     negative experience?

8          PROSPECTIVE JUROR:  No.  It wasn't a negative

9     experience, not at all.

10         THE COURT:  Any of the other cases in Superior

11    Court, any of those stand out?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Anything about your prior jury service

14    that would make you hesitant to serve on a jury again?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Okay.  Mr. Temple?

17         MR. TEMPLE:  I have no questions.

18         THE COURT:  Mr. Taaffe?

19         MR. TAAFFE:  No questions.

20         THE COURT:  Okay.  Thank you, ma'am.

21         PROSPECTIVE JUROR:  Thank you.

22         THE COURT:  No challenges to Ms. Johnson?

23         MR. TAAFFE:  No.

24         THE COURT:  Okay.  She's qualified.

25         1258.

 1                 Good morning, sir.

 2                 PROSPECTIVE JUROR:  Good morning.

 3                 THE COURT:  How are you?

 4                 PROSPECTIVE JUROR:  Not too bad.  How are you?

 5                 THE COURT:  Mr. Pomerleau?

 6                 PROSPECTIVE JUROR:  Pomerleau.

 7                 THE COURT:  Did I get that right?

 8                 PROSPECTIVE JUROR:  Yes, like l-o-w.

 9                 THE COURT:  Yes, water.

10                 So you're a journalist?

11                 PROSPECTIVE JUROR:  I am, yes.

12                 THE COURT:  What is Sightline Media Group?

13                 PROSPECTIVE JUROR:  So our biggest branch is

14     *Defense News* and *Military Times*.  I write for a smaller

15     sister publication called *C4ISRNET*.  We focus mostly on

16     technology.  I think drones, cyber, some emerging concepts,

17     a little bit of work force for the Department of Defense and

18     the intelligence community.

19                 THE COURT:  So you have a technical background.

20     What did you study?

21                 PROSPECTIVE JUROR:  I studied political science in

22     college, so no actual technology background.

23                 THE COURT:  How long have you been with Sightline?

24                 PROSPECTIVE JUROR:  A year last week.

25                 THE COURT:  Where were you before that?

1          PROSPECTIVE JUROR:  I was doing some freelance

2     work, mostly for a company called 1105 Media, and I was

3     doing pretty much the exact same type of reporting.

4          THE COURT:  What sparked your interest in defense

5     technology?

6          PROSPECTIVE JUROR:  It was a little bit by

7     accident.  I actually started kind of blogging as a way to

8     get into journalism out of college.

9          THE COURT:  Uh-huh.

10          PROSPECTIVE JUROR:  And I was interested in

11     defensive foreign policy and did a lot of research and

12     writing on national security and journal policy, which was

13     kind of a conduit into technology.

14          THE COURT:  Where did you go to school?

15          PROSPECTIVE JUROR:  A small school out in Western

16     Massachusetts called Westfield State.

17          THE COURT:  Where are you from?  Are you from

18     Massachusetts?

19          PROSPECTIVE JUROR:  Yes, about ten minutes outside

20     of Providence, Rhode Island.

21          THE COURT:  You answered yes to Question 19, legal

22     training.

23          PROSPECTIVE JUROR:  I was a paralegal/case worker

24     for a law firm in Providence, Rhode Island.  I specialized

25     in Social Security disability law helping people with their

1    Social Security disability claims, SSDI and SSI.

2              THE COURT:  How long did you do that for?

3              PROSPECTIVE JUROR:  Like nine or ten months.

4              THE COURT:  Did the firm have an employment

5    practice?

6              PROSPECTIVE JUROR:  We did personal injury.  I

7    think we started doing medical malpractice right before I

8    left, and I don't remember if there was -- actually, I think

9    there was a very small -- it was headed up by, like, one

10   lawyer.  I don't even think she had a paralegal.

11             THE COURT:  So you weren't involved with that

12   particular lawyer?

13             PROSPECTIVE JUROR:  No.  I just did the Social

14   Security.

15             THE COURT:  All plaintiff's side?

16             PROSPECTIVE JUROR:  I'm sorry?

17             THE COURT:  All plaintiff's side or claimant's

18   side?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Mr. Temple?

21             MR. TEMPLE:  I don't have any questions.  Thank

22   you.

23             THE COURT:  Mr. Taaffe?

24             MR. TAAFFE:  No questions.

25             THE COURT:  Okay.  Thank you, sir.

```
 1                PROSPECTIVE JUROR:  Thank you.

 2                THE COURT:  Okay.  Any challenges to

 3      Mr. Pomerleau?

 4                MR. TAAFFE:  No.

 5                THE COURT:  Mr. Temple?

 6                MR. TEMPLE:  No, sir.

 7                THE COURT:  Okay.  He's qualified.

 8                934.

 9                Ms. Brown, how are you?

10                PROSPECTIVE JUROR:  I'm fine.  How are you?  Good

11      morning.

12                THE COURT:  Thank you for your service.

13                PROSPECTIVE JUROR:  Thank you.

14                THE COURT:  So you're a bank teller, huh?

15                PROSPECTIVE JUROR:  Yes, I am.

16                THE COURT:  How long have you done that?

17                PROSPECTIVE JUROR:  For ten years.

18                THE COURT:  Ten years?

19                PROSPECTIVE JUROR:  Ten.

20                THE COURT:  Ten years.  What did you do before you

21      became a bank teller?

22                PROSPECTIVE JUROR:  Before then, I worked for the

23      U.S. Information Agency.

24                THE COURT:  Okay.  What did you do with them?

25                PROSPECTIVE JUROR:  My last position with them was
```

1    an administrative officer.  I worked as a liaison between

2    personnel and the program office.

3            THE COURT:  Okay.  In that job, were you ever

4    involved in sort of making personnel decisions or

5    recommendations or handling grievances, anything of that

6    nature?

7            PROSPECTIVE JUROR:  Now, I did get involved with

8    the performance process, evaluations, making recommendations

9    to managers if anything should be changed in the

10   evaluations, if there was any problems.

11           THE COURT:  So were you a management-level

12   employee there?

13           PROSPECTIVE JUROR:  Not management, no.

14           THE COURT:  Okay.

15           PROSPECTIVE JUROR:  And then also posting

16   positions to be filled in the program office.

17           THE COURT:  So your duties were mostly

18   administrative?

19           PROSPECTIVE JUROR:  Administrative.

20           THE COURT:  Are you from D.C.?

21           PROSPECTIVE JUROR:  I'm sorry?

22           THE COURT:  Are you from D.C.?

23           PROSPECTIVE JUROR:  No, from North Carolina.  I

24   grew up in North Carolina.

25           THE COURT:  Whereabout?

1              PROSPECTIVE JUROR:  Rutherford, North Carolina,

2      between Asheville and Charlotte.

3              THE COURT:  How long have you lived in Washington?

4              PROSPECTIVE JUROR:  Since I graduated from high

5      school.  50 years.  50 years.

6              THE COURT:  You have some prior jury service,

7      right?

8              PROSPECTIVE JUROR:  I did.  I served in grand jury

9      twice over 30 years ago.

10             THE COURT:  Wow.

11             PROSPECTIVE JUROR:  And then petit jury.  I guess

12     my last jury was about almost ten years ago.

13             THE COURT:  Do you remember where was that?  Here,

14     or was that in Superior Court?

15             PROSPECTIVE JUROR:  It wasn't in this court so it

16     must have been the other.

17             THE COURT:  Do you remember what kind of case that

18     was?

19             PROSPECTIVE JUROR:  The last one was a man was

20     charged with carrying a concealed weapon, and before that it

21     was drug related.

22             THE COURT:  Keep your voice up.  What was the

23     second one?

24             PROSPECTIVE JUROR:  Well, the last one was a

25     person -- a man carrying a concealed weapon.  And then the

1   one before that was drug related.

2              THE COURT:  Okay.  Just taking those two, did the

3   jury reach verdicts in each one of those cases?

4              PROSPECTIVE JUROR:  The drug-related one, no.  It

5   ended in a hung jury.

6              THE COURT:  Okay.

7              PROSPECTIVE JUROR:  But the carrying a concealed

8   weapon, we did find him guilty.

9              THE COURT:  Okay.  Were you the foreperson in

10   either of those two or any of the other ones that you've

11   been on?

12              PROSPECTIVE JUROR:  No.  Not in those two, no.

13              THE COURT:  What about --

14              PROSPECTIVE JUROR:  Grand jury, I did serve as the

15   foreperson on the grand jury.

16              THE COURT:  Does anything about your prior jury

17   experience, particularly the hung jury, make you hesitant to

18   serve on a jury again?

19              PROSPECTIVE JUROR:  No, it doesn't.

20              THE COURT:  Those were positive experiences, in

21   your view?

22              PROSPECTIVE JUROR:  It was.

23              THE COURT:  Okay.  Mr. Temple?

24              MR. TEMPLE:  I apologize.  What agency did you --

25              PROSPECTIVE JUROR:  United States Information

1    Agency.

2              MR. TEMPLE:  How many years did you work there?

3              PROSPECTIVE JUROR:  28 years.

4              MR. TEMPLE:  28 years.  And during that 28-year

5    time, to the extent that you were involved in personnel

6    matters in any way, did any of those matters involve

7    disciplinary actions or terminations?

8              PROSPECTIVE JUROR:  Now, I really wasn't a

9    personnel specialist so I didn't get involved in that

10   process.  I did get involved in making recommendations to

11   managers before they sent the evaluations over to personnel.

12   If I saw that there was anything in there of a disciplinary

13   nature that was not -- how should I say it? -- that did not

14   follow the procedures, then I would recommend that they

15   remove that and give the person an opportunity to improve

16   themselves.

17             But I never got involved with any issues where a

18   person was terminated.

19             MR. TEMPLE:  Thank you.

20             THE COURT:  Mr. Taaffe?

21             MR. TAAFFE:  No questions.

22             THE COURT:  Thank you, Ms. Brown.

23             PROSPECTIVE JUROR:  Uh-huh.

24             THE COURT:  Any challenge to Ms. Brown?

25             MR. TEMPLE:  No, sir.

```
 1                     MR. TAAFFE:  No.
 2                     THE COURT:  Okay.  She's qualified.  We're making
 3          good progress.  That's the first eight.
 4                     Okay.  943, please.  Good morning, Ms. Long, how
 5          are you?
 6                     PROSPECTIVE JUROR:  Good morning.  How are you?
 7                     THE COURT:  How are you feeling today?
 8                     PROSPECTIVE JUROR:  Good.
 9                     THE COURT:  Did you have a nice weekend?
10                     PROSPECTIVE JUROR:  I had to work.
11                     THE COURT:  So you work at Macy's, huh?
12                     PROSPECTIVE JUROR:  Yes.
13                     THE COURT:  Which department?
14                     PROSPECTIVE JUROR:  Juniors.
15                     THE COURT:  How long have you been there?
16                     PROSPECTIVE JUROR:  Eight years.
17                     THE COURT:  Were you in retail before that?
18                     PROSPECTIVE JUROR:  No.  I used to work in a
19          supervised position in housekeeping at Howard University.
20                     THE COURT:  Supervisory position in housekeeping
21          at Howard University?
22                     PROSPECTIVE JUROR:  Yes.
23                     THE COURT:  How long did you do that before you
24          joined Macy's?
25                     PROSPECTIVE JUROR:  Thirty -- 34 years.
```

```
1                    THE COURT:  Are you from D.C.?

2                    PROSPECTIVE JUROR:  Virginia.

3                    THE COURT:  From Virginia?

4                    PROSPECTIVE JUROR:  Uh-huh.

5                    THE COURT:  How long have you lived in the

6       District?

7                    PROSPECTIVE JUROR:  Probably about 30.

8                    THE COURT:  Okay.  You answered yes to Question 5.

9       You think you might know somebody on that list that I read

10      out?

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  Who do you think you know?

13                   PROSPECTIVE JUROR:  Sylvia Brown.  Not for sure

14      though.

15                   THE COURT:  Mr. Temple, Sylvia Brown is a HUD

16      employee; is that correct?

17                   MR. TEMPLE:  Yes, sir.

18                   THE COURT:  Do you know a Sylvia Brown that works

19      at HUD?

20                   PROSPECTIVE JUROR:  I don't know if that's the

21      same one.  She wasn't working there when I knew her.

22                   THE COURT:  Okay.  When did you know her?

23                   PROSPECTIVE JUROR:  We kind of grew up together

24      so -- if it's the same one.  I'm not sure if it's the same

25      one.
```

1          THE COURT:  Okay.  When's the last time you saw

2     her?

3          PROSPECTIVE JUROR:  Maybe six years or so ago.

4          THE COURT:  Okay.  You don't know what your Sylvia

5     Brown does?  Do you know what she does for a living?

6          PROSPECTIVE JUROR:  No, I don't.

7          THE COURT:  How old of a lady?  She's your age?

8          PROSPECTIVE JUROR:  Maybe a little younger.  Maybe

9     in her 50s.  I'm not for sure.

10          THE COURT:  How old is Ms. Brown?

11          MR. TAAFFE:  I would guess somewhere between 40

12     and 65.

13          THE COURT:  Other than that, you answered yes to

14     Question 13 about having worked at a hostile work

15     environment.  Tell us about that.  Why did you answer yes?

16          PROSPECTIVE JUROR:  Well, when I was working for

17     Howard, they had transferred over to a contractor, and so

18     that kind of -- that environment was way different than what

19     Howard was.  I guess I had to get used to it, but I really

20     didn't -- did never get used to it, so...  And the employees

21     and other people that works there was kind of hostile to me

22     as far as me working and things that I did wasn't really

23     good enough for them.  It seemed like I did this wrong and I

24     did that.

25          THE COURT:  So when they switched to a contractor

1    to oversee housekeeping --

2              PROSPECTIVE JUROR:  Right.

3              THE COURT:  -- you felt that they were overly

4    critical of you; is that fair to say?

5              PROSPECTIVE JUROR:  Right, uh-huh.

6              Then I got -- then maybe I had been there for a

7    year, then I got laid off, and that kind of -- for no kind

8    of reason at all.  They just kind of laid me off, and that

9    was very, very devastating.

10             THE COURT:  Yes.  Did you file any complaints or

11   did you complain internally about that to anybody?

12             PROSPECTIVE JUROR:  No.  My husband -- my husband

13   told me just...

14             THE COURT:  Mr. Temple?

15             MR. TEMPLE:  I have no questions.

16             THE COURT:  Mr. Taaffe?

17             MR. TAAFFE:  No questions.

18             THE COURT:  Thank you, ma'am.

19             PROSPECTIVE JUROR:  Thank you.

20             MR. TEMPLE:  Oh, I'm sorry, did you go to high

21   school with Sylvia Brown?

22             PROSPECTIVE JUROR:  No.  We just kind of grew up

23   together when I came to D.C.

24             MR. TEMPLE:  What time were you all -- were you

25   friends?

1          PROSPECTIVE JUROR:  I hung around with her when I
2     was 18.
3          MR. TEMPLE:  18.  Does she have any children?
4          PROSPECTIVE JUROR:  She does now, yes.
5          MR. TEMPLE:  Do you know how many children she
6     has?
7          PROSPECTIVE JUROR:  I know she had two boys and a
8     girl.
9          MR. TEMPLE:  Do you know any of their names?
10          PROSPECTIVE JUROR:  I do.  I forgot the names, but
11     I know them.  I can't think of them offhand.  I think one of
12     the name is Michi.
13          MR. TEMPLE:  Michi?
14          PROSPECTIVE JUROR:  Uh-uh.
15          MR. TEMPLE:  And that's the boy or the girl?
16          PROSPECTIVE JUROR:  Boy.  And the girl...  I don't
17     know the girl.
18          MR. TEMPLE:  Do you know how old they are about?
19          PROSPECTIVE JUROR:  Well, I think in their 30s
20     now, I think.
21          MR. TEMPLE:  Thank you.
22          THE COURT:  Thank you, ma'am.
23          PROSPECTIVE JUROR:  You're welcome.
24          THE COURT:  Any challenge to Ms. Long?
25          MR. TEMPLE:  Not on the record unless we can show

```
 1    that there was a relationship between her and Ms. Brown.
 2                THE COURT:  Assuming that it is the same --
 3    assuming it is the same person, which I doubt based on what
 4    she said, it's not a close enough relationship to create a
 5    problem, from my view.
 6                Mr. Taaffe?
 7                MR. TAAFFE:  No objection.
 8                MR. TEMPLE:  Your Honor, I think assuming that
 9    they are and they were friends, I think the record should
10    reflect that to the extent that they were friends, and close
11    friends is the way she states it, I think it may inform a
12    bias on her part.  They're not distant friends or just
13    passing friends.  She indicated that they grew up together
14    when she came here.
15                THE COURT:  I will qualify her.  If she happens to
16    get on the jury and she sees the witness, we'll voir dire
17    her; and if there's an issue, then we can take steps then,
18    okay?
19                MR. TEMPLE:  Thank you.
20                THE COURT:  Okay.  1108.
21                PROSPECTIVE JUROR:  Good morning.
22                THE COURT:  Good morning.
23                PROSPECTIVE JUROR:  How are you doing?
24                THE COURT:  How are you doing?  I like your Polo
25    shirt.
```

```
 1                    PROSPECTIVE JUROR:  Thank you.

 2                    THE COURT:  So you're a project manager for ICI

 3        Services.  Tell us what that is.

 4                    PROSPECTIVE JUROR:  Defense contractor.

 5                    THE COURT:  Okay.  What kind of contracts?

 6                    PROSPECTIVE JUROR:  We do -- we build ships for

 7        the Navy.

 8                    THE COURT:  What's your role?

 9                    PROSPECTIVE JUROR:  I am a project manager, so I

10        have my own group of people that I manage.

11                    THE COURT:  How large of an operation is it?

12                    PROSPECTIVE JUROR:  The operation, we have

13        about -- we're still a medium-sized company.  We have 500-

14        something employees.  I just started working there about

15        three years ago.

16                    THE COURT:  Are you a Navy guy?

17                    PROSPECTIVE JUROR:  Yes.

18                    THE COURT:  How long were you in the Navy?

19                    PROSPECTIVE JUROR:  Five years.

20                    THE COURT:  What did you do?

21                    PROSPECTIVE JUROR:  I was an administrator,

22        personnel.

23                    THE COURT:  At the department of the Navy?

24                    PROSPECTIVE JUROR:  No, no, this was -- no, I work

25        for a contractor now.
```

```
 1                    THE COURT:  I know, okay.
 2                    PROSPECTIVE JUROR:  When I was in the Navy, I was
 3          actually a Navy person.
 4                    THE COURT:  Okay.
 5                    PROSPECTIVE JUROR:  Now, we support the United
 6          States Navy.
 7                    THE COURT:  What rank were you?
 8                    PROSPECTIVE JUROR:  I was a personnelman second
 9          class.
10                    THE COURT:  And where were you stationed?
11                    PROSPECTIVE JUROR:  California.
12                    THE COURT:  The whole time?
13                    PROSPECTIVE JUROR:  No.  We were down in Concord,
14          California.  I was there from about '81 until '86.
15                    THE COURT:  Okay.  And what did you do after you
16          got out of the Navy?
17                    PROSPECTIVE JUROR:  I started working for a
18          support contractor, a small company down in Virginia.
19                    THE COURT:  Where are you from?
20                    PROSPECTIVE JUROR:  D.C.
21                    THE COURT:  Did you go to school here?
22                    PROSPECTIVE JUROR:  Finished school here.
23                    THE COURT:  Where did you go?  Where did you
24          finish?
25                    PROSPECTIVE JUROR:  I went to UDC.  I graduated
```

1    there with a bachelor's degree in criminal justice.  And

2    then I went to University of Oklahoma where I got a master's

3    degree in public administration.

4              THE COURT:  Okay.  You answered yes to 13.

5              PROSPECTIVE JUROR:  Uh-huh.

6              THE COURT:  You have experienced or you've worked

7    in what you consider to be a hostile work environment.  Tell

8    us about that.

9              PROSPECTIVE JUROR:  Well, this was -- yes, this

10   was back in the '80s.  I worked for a small company,

11   contractor.  That was one of the first companies I worked

12   for once I got out of the military.  The company had a claim

13   against them for racial discrimination, and one of the

14   issues was, you know, hostile environment.

15             And the person went to EEOC.  EEOC came in.  They

16   investigated the issue, and they ruled in favor of the

17   company, that there was no hostile environment.

18             THE COURT:  And was there a lawsuit filed after

19   that, or did that end the matter?

20             PROSPECTIVE JUROR:  No, that was the end of it

21   that I know of.

22             THE COURT:  Were you a witness in that matter?

23             PROSPECTIVE JUROR:  No, but -- you know, the

24   person put me as a witness, but they never talked to me.

25             THE COURT:  Would you have supported the

1    allegations of that person?

2              PROSPECTIVE JUROR:  In some cases, yes.

3              THE COURT:  Uh-huh.

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  But you were never asked to testify?

6              PROSPECTIVE JUROR:  No, no.

7              THE COURT:  Did you provide an affidavit or a

8    declaration of any kind?

9              PROSPECTIVE JUROR:  No, they never -- they talked

10   to upper management, and I think they talked to, you know,

11   HR so it never got down to my level.

12             THE COURT:  And in what respect did you think the

13   environment was, in fact, hostile?

14             PROSPECTIVE JUROR:  Well, it was more of a change

15   in the environment.  You know, there were more minorities

16   coming into the business, and in Virginia at the time there

17   was, you know, all-white males working in defense

18   contracting at the time so the industry was changing.  So --

19             THE COURT:  This was down in Norfolk?  Where was

20   it?

21             PROSPECTIVE JUROR:  No.  This was actually in

22   Arlington, Virginia.

23             THE COURT:  In Arlington?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  No. 18, prior jury service?

```
 1            PROSPECTIVE JUROR:  Yes.  There was -- I think it
 2    might have been maybe two and a half, three years ago now.
 3    This was a criminal case in district court.
 4            THE COURT:  In this court or in the city court?
 5            PROSPECTIVE JUROR:  City court.
 6            THE COURT:  What were the charges?
 7            PROSPECTIVE JUROR:  It was a robbery charge, and
 8    it was supposedly robbery with a handgun, but the guy -- the
 9    information -- the evidence that they had was also
10    circumstantial, but it wasn't hard enough.
11            THE COURT:  So you acquitted?
12            PROSPECTIVE JUROR:  Yes.
13            THE COURT:  Anything about -- were you the
14    foreperson in that jury?
15            PROSPECTIVE JUROR:  No.
16            THE COURT:  Anything about that experience make
17    you less want to be on a jury again?
18            PROSPECTIVE JUROR:  No.
19            THE COURT:  Okay.  Mr. Temple -- one more.  Legal
20    training.  You have some legal training.
21            PROSPECTIVE JUROR:  I have a degree in criminal
22    justice.  I also have a certification as a legal assistant,
23    but I don't work in management.
24            THE COURT:  Have you ever worked in a law firm or
25    worked for a lawyer?
```

1          PROSPECTIVE JUROR:  No, no.

2          THE COURT:  No.

3          PROSPECTIVE JUROR:  Change of heart.

4          THE COURT:  I understand.

5          Mr. Temple?

6          MR. TEMPLE:  Yes.  How long were you in the Navy?

7          PROSPECTIVE JUROR:  Six years.

8          MR. TEMPLE:  And you mentioned that you did some

9    personnel work in the --

10          PROSPECTIVE JUROR:  Yes.  I was a personnelman.

11          MR. TEMPLE:  What does that mean?

12          PROSPECTIVE JUROR:  That was an administrator,

13    that I take care of the records for the individuals -- and

14    this was just for the initiative, not for the commissioned

15    officers -- and we take care of the service records.  That

16    means dealing with the HR -- all the HR needs, you know, all

17    of their dental and health benefits, all the training and

18    stuff, you -- I was the individual that annotated that in

19    the record, schedule courses for them and things of that

20    nature.

21          MR. TEMPLE:  Okay.  And in your present position,

22    you're a project manager?

23          PROSPECTIVE JUROR:  I'm a project manager.

24          MR. TEMPLE:  And does that involve you making any

25    personnel types of decisions?

1          PROSPECTIVE JUROR:  Yes.  I have right now --

2     well, I used to have about 12 people working for me.  Right

3     now I only have about five working for me because we had to

4     transition to another company so -- yes, so I deal with, you

5     know, the day-to-day decisions on the work tasking and

6     everything else, the money that they -- bonuses and the

7     salary increases and things of that nature.

8          MR. TEMPLE:  And you also conduct personnel

9     evaluations?

10          PROSPECTIVE JUROR:  Yes, I do.

11          MR. TEMPLE:  And any type of discipline,

12     suspension, termination stuff?

13          PROSPECTIVE JUROR:  No.  I only make

14     recommendations.  That's HR's job to do that.  And plus I

15     have a -- even though I'm a project manager, I have a

16     program manager above me and a director above him.

17          So I give recommendations.  I don't necessarily

18     make those decisions.

19          MR. TEMPLE:  Yes, sir.  Thank you.

20          THE COURT:  Mr. Taaffe?

21          MR. TAAFFE:  No questions.

22          THE COURT:  Thank you, sir.

23          PROSPECTIVE JUROR:  Thank you.

24          THE COURT:  Take care.

25          Okay.  Any challenges to Mr. Bright?

```
 1                    MR. TAAFFE:  Don?

 2                    MR. TEMPLE:  No, sir.

 3                    MR. TAAFFE:  No.

 4                    THE COURT:  Okay.  He's qualified.

 5                    421.

 6                    Hello, Ms. Zanni.

 7                    PROSPECTIVE JUROR:  Hello.

 8                    THE COURT:  How are you?

 9                    PROSPECTIVE JUROR:  Great.  How are you?

10                    THE COURT:  How are you today?

11                    PROSPECTIVE JUROR:  Great.

12                    THE COURT:  So you're a speech pathologist; is

13     that right?

14                    PROSPECTIVE JUROR:  Correct.

15                    THE COURT:  So you can correct all of my "ums" and

16     "ahs" and "okays."

17                    PROSPECTIVE JUROR:  Can do.  Can do.  Every one.

18                    THE COURT:  Good.  I need that.  How long have you

19     been doing that?

20                    PROSPECTIVE JUROR:  It will be ten years in 2018.

21                    THE COURT:  Have you been with Montgomery County

22     Schools that whole time?

23                    PROSPECTIVE JUROR:  No.  This will be my third

24     full school year coming up.  I was hired in November 2014.

25                    But before that I worked in private practice, and
```

1    before that I worked at an outpatient rehabilitation

2    hospital working with pediatrics in Northwest Ohio.

3              THE COURT:  Where are you from?

4              PROSPECTIVE JUROR:  I'm from Northeast Ohio.

5              THE COURT:  Where?

6              PROSPECTIVE JUROR:  Northeast Ohio, from the

7    Youngstown area.

8              THE COURT:  And how long have you been in

9    Washington?

10             PROSPECTIVE JUROR:  I moved here in 2010.  2010,

11   yes.

12             THE COURT:  In connection with your private

13   practice, did you ever work in the courts at all?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Or been appointed by --

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Asked to testify or anything like

18   that?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  You answered yes to 18, which is prior

21   jury service.

22             PROSPECTIVE JUROR:  Uh-huh.

23             THE COURT:  Tell us about that.

24             PROSPECTIVE JUROR:  Yes.  So prior to living in

25   Washington, D.C., I lived in Arlington, Virginia, so I

```
 1      served in Arlington County, and there was a sexual assault
 2      type trial, and that was it.
 3                  THE COURT:  How long ago was that?
 4                  PROSPECTIVE JUROR:  Oh, at least two years ago.
 5                  THE COURT:  And did the jury reach a verdict?
 6                  PROSPECTIVE JUROR:  Yes.
 7                  THE COURT:  And what was it?
 8                  PROSPECTIVE JUROR:  Not guilty.
 9                  THE COURT:  And it was a positive experience?
10                  PROSPECTIVE JUROR:  Yes.
11                  THE COURT:  Anything about that experience that
12      would lead you not to want to serve on a jury again?
13                  PROSPECTIVE JUROR:  No.
14                  THE COURT:  Were you the foreperson of the jury?
15                  PROSPECTIVE JUROR:  No.
16                  THE COURT:  Mr. Temple?
17                  MR. TEMPLE:  No questions.
18                  THE COURT:  Mr. Taaffe?
19                  MR. TAAFFE:  No questions.
20                  THE COURT:  Thank you, ma'am.
21                  PROSPECTIVE JUROR:  Have a great day.
22                  THE COURT:  You, too.
23                  Any objections?
24                  MR. TAAFFE:  No.
25                  MR. TEMPLE:  No, sir.
```

1          THE COURT:  She's qualified.

2          575, please.

3          The M is silent?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Mruk.  Ms. Mruk, how are you?

6          PROSPECTIVE JUROR:  Good.  Thank you.

7          THE COURT:  Thanks for coming down.

8          You're a fundraiser for The Nature Conservancy; is

9     that right?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  How is fundraising going these days?

12          PROSPECTIVE JUROR:  Quite well actually.

13          THE COURT:  I would imagine.

14          How long have you been doing that?

15          PROSPECTIVE JUROR:  Three and a half years.

16          THE COURT:  And where were you before?

17          PROSPECTIVE JUROR:  I was at a small fundraising

18     agency before that.

19          THE COURT:  What kinds of clients did your agency

20     raise money for?

21          PROSPECTIVE JUROR:  All variety of nonprofit

22     organizations.

23          THE COURT:  No particular subject areas or

24     industries?

25          PROSPECTIVE JUROR:  No; arts, civil rights, gun

1     control, women's rights.

2              THE COURT:  Have you always been in development?

3              PROSPECTIVE JUROR:  I have.

4              THE COURT:  Have you worked for any other

5     organizations besides The Nature Conservancy?

6              PROSPECTIVE JUROR:  Yes.  I actually worked for a

7     nonprofit legal services organization for six years, which

8     is why I answered the legal question the way I did, and then

9     I worked for an antitobacco advocacy organization, and then

10    the agency.

11             THE COURT:  Okay.  Are you from Washington?

12             PROSPECTIVE JUROR:  From?

13             THE COURT:  Where are you from?

14             PROSPECTIVE JUROR:  From Pennsylvania originally.

15             THE COURT:  And you moved here after school?

16             PROSPECTIVE JUROR:  I moved here for school and

17    stayed.

18             THE COURT:  Where did you go to school?

19             PROSPECTIVE JUROR:  GW.

20             THE COURT:  What did you study?

21             PROSPECTIVE JUROR:  Political communications.

22             THE COURT:  You have prior jury service --

23             PROSPECTIVE JUROR:  I do.

24             THE COURT:  -- is that correct?

25             PROSPECTIVE JUROR:  Yes.

```
 1                THE COURT:  Tell us about that.

 2                PROSPECTIVE JUROR:  I have served twice in D.C.

 3     Superior Court; once on a civil trial, and once on a

 4     criminal trial.

 5                THE COURT:  What was the civil trial?

 6                PROSPECTIVE JUROR:  It was a suit against WMATA, a

 7     woman who had fallen on the bus.

 8                THE COURT:  Personal injury?

 9                PROSPECTIVE JUROR:  Yes.

10                THE COURT:  Did you reach a verdict?

11                PROSPECTIVE JUROR:  We did.

12                THE COURT:  And for the plaintiff or for WMATA, or

13     split?

14                PROSPECTIVE JUROR:  I'm not sure.  I don't

15     remember.  I think it was for the plaintiff, but I'm not

16     sure.

17                THE COURT:  Were you the foreperson --

18                PROSPECTIVE JUROR:  No.

19                THE COURT:  -- on that jury?

20                And what about the other Superior Court case?

21                PROSPECTIVE JUROR:  It was a criminal trial for

22     weapons possession.

23                THE COURT:  The verdict in that one?

24                PROSPECTIVE JUROR:  We found on the part of the

25     defendant on that one.
```

```
1              THE COURT:  An acquittal?

2              PROSPECTIVE JUROR:  Acquitted, yes.

3              THE COURT:  Again, were you the foreperson?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Anything about those experiences make

6    you less likely to want to serve on a jury again?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Mr. Temple?

9              MR. TEMPLE:  No questions.

10             THE COURT:  Mr. Taaffe?

11             MR. TAAFFE:  No questions.

12             THE COURT:  Thank you.

13             MR. TEMPLE:  Thank you.

14             PROSPECTIVE JUROR:  Thanks.

15             MR. TAAFFE:  Two more.

16             THE COURT:  Two more.  Making good progress this

17   morning.

18             1118.

19             PROSPECTIVE JUROR:  Good morning.

20             THE COURT:  Good morning, Mr. Thompson.  How are

21   you?  Stand in the middle and speak into the mic.

22             PROSPECTIVE JUROR:  Yes, sir.

23             THE COURT:  So you're a lawyer, huh?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  What kind of law do you practice?
```

 1           PROSPECTIVE JUROR:  Transactional.  Mostly private

 2      investment firms and private investment fund review and

 3      general finance and transactional matters.

 4           THE COURT:  Okay.  And have you always been in

 5      that line of work?

 6           PROSPECTIVE JUROR:  Mostly.  I've been a lawyer

 7      since 2005.  I started up in New York City and did more M&A

 8      and capital markets work there.  I followed my girlfriend to

 9      Richmond -- she's also a lawyer -- and ended up more on the

10      private investment fund side, and then followed her back up

11      here.

12           THE COURT:  Where did you go to law school?

13           PROSPECTIVE JUROR:  Sorry?

14           THE COURT:  Where did you go to law school?

15           PROSPECTIVE JUROR:  Virginia.

16           THE COURT:  Was it fun?

17           PROSPECTIVE JUROR:  Was it fun?

18           THE COURT:  Did you play on the softball team?

19           PROSPECTIVE JUROR:  I played on my section

20      softball team, not on the big tournament team.

21           THE COURT:  I hear they take that pretty

22      seriously.

23           PROSPECTIVE JUROR:  They do.  They do.  I'm more

24      of a ground ball hitter than a home run hitter so...

25           THE COURT:  Did you work during the summers in law

1    firms?

2              PROSPECTIVE JUROR:  I did.  I worked at Dorsey &

3    Whitney my first summer in Minneapolis, and I worked at

4    Willkie Farr where I started in New York my second summer,

5    and again at Dorsey & Whitney.  And then I left Willkie when

6    I moved to Richmond and went to a firm called Hirschler

7    Fleischer.

8              THE COURT:  And did you do a litigation rotation

9    even though you were interested in transactional work?

10             PROSPECTIVE JUROR:  I did a litigation rotation at

11   Dorsey, and I was reviewing in sort of a litigation piece of

12   bankruptcy a brief for arguments from opposing counsel in

13   Boston, and there was a lot of mischaracterization of the

14   case law, as I understood the case law as a very junior

15   summer associate, and it sort of turned me off to the

16   litigation side.

17             And then I had to do a fake court for legal

18   writing and again at Willkie, and it just wasn't my thing.

19             THE COURT:  Did you work in labor and employment

20   at all?

21             PROSPECTIVE JUROR:  I took an employment class and

22   did not love it.

23             THE COURT:  Why didn't you love it?

24             PROSPECTIVE JUROR:  It was very surprisingly dry.

25   It was a lot of procedural aspects, and I think at that

1    point I was sort of headed towards the transaction side of

2    things.

3             THE COURT:  Okay.  18, you have prior jury

4    service.  Tell us about that.

5             PROSPECTIVE JUROR:  I do not have -- I may have

6    misunderstood.  I think that's a different card.

7             THE COURT:  Oh, I'm sorry.  You're correct.  The

8    cards are out of order.

9             Why don't you tell me which questions you

10   answered.

11            PROSPECTIVE JUROR:  I think I got three answers.

12            THE COURT:  You're smart enough to remember.

13            PROSPECTIVE JUROR:  First was I've been a

14   defendant.  It was a default judgment I had no notice of in

15   a landlord/tenant matter in Charlottesville.  That was in

16   2002 or '3.  I guess 2003.  I have two speeding tickets.  I

17   guess technically I was a defendant for those but just paid

18   them and had no court appearance.  And then I think I

19   answered the employment training simply because I took

20   employment law, and the lawyer question because I'm a

21   lawyer.

22            THE COURT:  How did the landlord/tenant dispute

23   conclude?

24            PROSPECTIVE JUROR:  Well, instead of reopening the

25   case -- I found out about it years later when I was

```
 1      preparing my bar materials -- I just entered a settlement

 2      with the landlord and had the judgment, I guess, settled.

 3                  THE COURT:  Mr. Temple?

 4                  MR. TEMPLE:  Other than employment law being

 5      dry -- this is an employment case -- do you have any other

 6      kinds of feelings that would preclude you from being fair

 7      and impartial?

 8                  PROSPECTIVE JUROR:  No.  I mean, my parents had

 9      standard sort of white collar jobs and dealt with employees

10      and were employees, and you hear stories.  I've worked in

11      law firms where some people were better people than others,

12      but nothing that stands out.

13                  MR. TEMPLE:  Thank you.

14                  THE COURT:  Mr. Taaffe?

15                  MR. TAAFFE:  You said your girlfriend's a lawyer,

16      too?

17                  PROSPECTIVE JUROR:  Yes.

18                  MR. TAAFFE:  What area is she practicing?

19                  PROSPECTIVE JUROR:  Also private investment firms.

20      She's now in the pension -- the legal financial team who

21      works for the pension group at the World Bank and works on

22      investments for them.

23                  MR. TAAFFE:  No further questions.

24                  THE COURT:  Thank you, sir.

25                  MR. TEMPLE:  Thank you.
```

1          THE COURT:  Any challenge to Mr. Thompson?

2          MR. TEMPLE:  Nothing here.

3          MR. TAAFFE:  No.

4          THE COURT:  He's qualified.

5          I don't want to jinx it, but I don't think I've

6     ever gone 14 for 14.

7          MR. TAAFFE:  No, it's unusual.

8          THE COURT:  Has that ever happened to you,

9     Mr. Temple?  Let me get my numbers right here.

10          MR. TEMPLE:  Judge, I just wanted to -- you know,

11     there was a Sarah Knapp who works for the city, and the name

12     is very rare, and I know that this gentleman's name is

13     Knapp.

14          MR. TAAFFE:  1306.

15          MR. TEMPLE:  1306.  I would just like to exclude

16     or at least know if he's related to Sarah because we have --

17     she works for the city's legal office and is often involved

18     in these types of cases.

19          I didn't think about it when he was here.  He's

20     probably not.  He probably would have said something about

21     it so maybe that's not necessary.

22          THE COURT:  I can call him back.  I mean, the city

23     is not a party.

24          MR. TEMPLE:  But if she is -- we have had like

25     maybe five cases against each other.

```
1                    THE COURT:  Oh, I see.  I'll call him back.

2          866.

3               Ms. O'Riordan, how are you?

4          PROSPECTIVE JUROR:  Good.  How are you?

5          THE COURT:  Good.  How was your weekend?

6          PROSPECTIVE JUROR:  It was good.

7          THE COURT:  Thanks for your service.

8               Let's see here, you do business development for

9     Higher Logic.  Tell us what that is.

10              PROSPECTIVE JUROR:  It's an online community

11    platform.  It's software, but I'm right in Arlington, and we

12    sell to, like, associations and nonprofits mainly, but it's

13    basically a sales position.

14              THE COURT:  So to allow for community interaction

15    on their websites and cases like that.

16              PROSPECTIVE JUROR:  Yes, it's like a privately

17    branded LinkedIn or Facebook group basically.

18              THE COURT:  How long have you done that?

19              PROSPECTIVE JUROR:  A little over two years.

20              THE COURT:  What did you do before?

21              PROSPECTIVE JUROR:  I worked for a company called

22    Unishippers.  And it was, like, third-party logistics, like

23    trucking.

24              THE COURT:  Doing bus dev also?

25              PROSPECTIVE JUROR:  No, that was -- I don't know,
```

1     my title was, like, freight consultant, but it was new

2     business that I was bringing in, and now I work with current

3     clients.

4              THE COURT:  Okay.  At Higher Logic do you have

5     government clients at all?  Do you supply software to any

6     government agencies?

7              PROSPECTIVE JUROR:  I don't think we work with any

8     government agency.  Well, we have over, like, a thousand

9     clients, but I think it's mainly just, like, nonprofits.  I

10    don't think that we work currently with any government

11    agencies.

12             THE COURT:  And where did you go to school?

13             PROSPECTIVE JUROR:  University of Pittsburgh.

14             THE COURT:  What did you study?

15             PROSPECTIVE JUROR:  What did I study?  Marketing

16    with a minor in economics.

17             THE COURT:  Are you from Pennsylvania?

18             PROSPECTIVE JUROR:  Yes, like an hour north of

19    Philadelphia.

20             THE COURT:  All right.  You answered yes to 13.

21    You've worked in an environment that you would consider to

22    be hostile; is that right?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Tell us about that.  Why did you

25    answer yes?

```
 1              PROSPECTIVE JUROR:  It was a restaurant that I

 2    worked at after I graduated college, but I -- the owner

 3    was -- he was just a bad person, and he was -- there was I

 4    feel like a lot of sexual harassment issues that were going

 5    on in the restaurant, but also I know, like, while I was

 6    there the owner had fired someone for being transgender.

 7              THE COURT:  For being what?

 8              PROSPECTIVE JUROR:  Transgender.  It just was --

 9    it was not a good place of work.

10              THE COURT:  Where was the restaurant?

11              PROSPECTIVE JUROR:  In Doylestown, Pennsylvania,

12    where I grew up.  Like an hour north of here.

13              THE COURT:  How big of a place?

14              PROSPECTIVE JUROR:  How big?

15              THE COURT:  Uh-huh.

16              PROSPECTIVE JUROR:  Like in what sense?  Amount of

17    employees?

18              THE COURT:  Amount of employees, yes.

19              PROSPECTIVE JUROR:  I guess maybe 25, 30.

20              THE COURT:  Were there ever any complaints against

21    this fellow, formal complaints or lawsuits?

22              PROSPECTIVE JUROR:  I don't know that there were

23    any formal complaints at least while I was there.  I know

24    there were some issues with taxes and them taking out more

25    taxes than they should have been taking out or saying that
```

1    we were making more money than we were actually making to

2    help with his taxes.

3              THE COURT:  But that was the reason you left the

4    restaurant, the harassment?

5              PROSPECTIVE JUROR:  That was one of the main

6    reasons, yes.

7              THE COURT:  And 19, legal training?

8              PROSPECTIVE JUROR:  Yes.  Well, my dad is a

9    lawyer, and he does, like, a lot of, like, civil-type stuff,

10   but in the summer sometimes I would come and work for him.

11             THE COURT:  Where is his office?

12             PROSPECTIVE JUROR:  In Philadelphia.

13             THE COURT:  And what kind of civil work does he

14   do?

15             PROSPECTIVE JUROR:  It really all depends.  I know

16   he does a lot with, like, labor and employment actually, and

17   occasionally he'll represent, like, family friends or

18   something if it's unrelated to that.  If it's -- like my

19   cousin was in trouble, so he represented him, but I think

20   it's mainly stuff like he represented, like, Temple

21   University and -- yes, just, like, mainly I think he

22   represents companies.

23             THE COURT:  Okay.  So on the labor work, do you

24   think he represents companies more, or does he represent

25   plaintiffs, or does he do both?

1          PROSPECTIVE JUROR:  I think he does a little bit

2     of both, but I would say it's mainly the companies that he's

3     representing.

4          THE COURT:  And Mr. Temple?

5          MR. TEMPLE:  Good morning.  Is there anything in

6     your experience in your workplace that you left that would

7     present a problem for you here in terms of being fair and

8     impartial?

9          PROSPECTIVE JUROR:  I mean, I guess I can just --

10    I can kind of recognize how difficult it is to be an

11    employee and to need a job and to pay the bills and to be

12    filing complaints against an employer because I know that

13    this guy who owned the restaurant was just not a good

14    person.  But everyone there kind of needed their job so...

15         MR. TEMPLE:  Would that experience -- and I

16    understand that.  Would that experience, however, prevent

17    you in a different workplace in this case where there may be

18    similar issues of hostility towards -- alleged hostility

19    towards employees, would that impede you or preclude you

20    from being fair and impartial?

21         PROSPECTIVE JUROR:  No, not necessarily.

22         MR. TEMPLE:  And you worked with your father.  How

23    many years has your dad been practicing?

24         PROSPECTIVE JUROR:  He's 62 now, and I think he

25    probably went to law school like in his 30s, so over 20

1    years.

2              MR. TEMPLE:  Did you go to court with your father

3    at times when you worked with him?

4              PROSPECTIVE JUROR:  Yes, I was going to say when I

5    was younger mainly, but yes.

6              MR. TEMPLE:  And is there anything in that

7    experience with your dad and his work and what he does in

8    the community that would impede you from being fair and

9    impartial?

10             PROSPECTIVE JUROR:  Not necessarily, no.

11             MR. TEMPLE:  Thank you.

12             THE COURT:  Mr. Taaffe?

13             MR. TAAFFE:  Has your father ever made any

14   comments, even offhandedly, that in his experience most

15   complaints in labor employment contexts tend to be valid, or

16   they tend to be invalid, or it just depends on the case?

17             PROSPECTIVE JUROR:  I think it honestly just

18   depends on the case.

19             MR. TAAFFE:  Could you serve on the jury without

20   talking about it with your dad?

21             PROSPECTIVE JUROR:  Yes.

22             MR. TAAFFE:  All right.  No further questions.

23             THE COURT:  Thank you, ma'am.

24             MR. TEMPLE:  Thank you.

25             THE COURT:  Okay.  Any challenge to Ms. O'Riordan?

```
1                    MR. TEMPLE:  No, sir.

2                    MR. TAAFFE:  No.

3                    THE COURT:  She's qualified.

4                    If Juror 1306 could approach.  That's the one who

5          is in the bathroom, okay.

6                    Why don't we take a ten-minute break.

7                    THE COURTROOM DEPUTY:  He's walking in right now.

8                    THE COURT:  Why don't we dismiss the rest, and

9          then we'll take a ten-minute break for you to think about

10         your peremptories, and then we'll go from there, okay?

11                   MR. TAAFFE:  For the peremptories, just to

12         clarify, any of the 14, or just the first eight?

13                   THE COURT:  Any of the 14.

14                   Mr. Temple, Mr. Taaffe, stay up briefly.  Juror

15         1306, could you approach, please.  Mr. Temple has one

16         follow-up question for you.

17                   MR. TEMPLE:  Do you -- your name is spelled K-n-a-

18         p-p?

19                   PROSPECTIVE JUROR:  Correct.

20                   MR. TEMPLE:  Do you know Sarah Knapp?

21                   PROSPECTIVE JUROR:  I do not.

22                   MR. TEMPLE:  Thank you, Your Honor.

23                   (This is the end of the bench conference)

24                   THE COURT:  Okay.  Ladies and gentlemen, if I have

25         not questioned you at the bench, you are excused.  You can
```

1     check in with the jury office.  They may need you for

2     another trial, or they may release you for the day.  But

3     thank you very much for coming down.

4             It is -- selecting a jury is much more of an art

5     than it is a science.  Sometimes we need to question more

6     people than we think we will initially, and I know it's

7     frustrating to have to wait and not to be able to be called

8     up, but the good news is you get -- you may get to go for

9     the day.  So thank you again for your service, and you may

10    be excused.

11            Okay.  Counsel, we'll take about a five-minute

12    break, and then we will reconvene.  So we'll stand in

13    recess.

14            (Recess taken)

15            THE COURT:  Okay.  Ladies and gentlemen, we're

16    going to play a game of musical chairs now, okay?  Would

17    Juror No. 1672 please take a seat in the gallery.

18            THE COURTROOM DEPUTY:  '92, 1692.

19            THE COURT:  1692.  And Juror No. 421, please take

20    that second seat.

21            Juror No. 1306, please take a seat in the gallery.

22    And Juror No. 1118, please take that seat.

23            And Juror 1258, please take a seat in the gallery.

24    And Juror 866, please take the vacant seat in the box.

25            Okay.  Counsel, approach.

```
 1                  (The following is a conference held at the
 2                   bench outside the hearing of the gallery)
 3                  MR. TEMPLE:  Your Honor, can we see our strike
 4        list?
 5                  THE COURT:  Lauren, would you give them the lists
 6        back.  Here it is.
 7                  THE COURTROOM DEPUTY:  They're still there.
 8                  MR. TEMPLE:  Your Honor, before we begin, there
 9        is -- this is -- the 1108 should have been 1118.
10                  THE COURT:  You wrote down the wrong number?
11                  MR. TEMPLE:  We can double-check.
12                  MR. TAAFFE:  We didn't strike 1108, so that's not
13        a problem with me.
14                  THE COURT:  I'm sorry?
15                  MR. TAAFFE:  We didn't strike 1108, so, you know,
16        it's not...
17                  MR. TEMPLE:  Yes, this is actually intended to be
18        1118.  That number is wrong because that's where -- the
19        number next to it is actually --
20                  THE COURT:  Slow down.
21                  MR. TEMPLE:  Sure.
22                  THE COURT:  You struck through and you intended to
23        strike who?
24                  MR. TEMPLE:  We intended to strike 1118.
25                  THE COURT:  You intended to strike 1118.  Who did
```

1     you strike?

2              MR. TEMPLE:  575, which is right next to it, but

3     we identified 1118 by description.

4              THE COURT:  Mr. Taaffe?

5              MR. TAAFFE:  I have no objection if you switch it

6     back.

7              THE COURT:  So what do we have to do?  We have to

8     just switch 1118 and 575.

9              MR. TAAFFE:  Right.

10             MR. TEMPLE:  My apologies, Your Honor and counsel.

11             THE COURT:  Okay.  Stay there.

12             (This is the end of the bench conference)

13             THE COURT:  Okay.  Would Juror 1118 please take a

14    seat in the gallery.  And Juror 575, please take the open

15    seat.

16             (The following is a conference held at the

17              bench outside the hearing of the gallery)

18             THE COURT:  Okay.  Any objections to this jury?

19             MR. TEMPLE:  No, sir.

20             THE COURT:  Mr. Taaffe?

21             MR. TAAFFE:  No.

22             THE COURT:  Okay.  This is your jury then?

23             MR. TEMPLE:  Yes.

24             THE COURT:  Okay.  Great.

25             (This is the end of the bench conference)

1          THE COURT:  Okay.  If you're still in the gallery,

2     you may be dismissed.  Please check with the jury -- please

3     check in with the jury office, and I appreciate your

4     service, and have a great day.

5          Okay.  Ladies and gentlemen, you may have guessed

6     that you are our jury in this case, so if I can have all of

7     you stand and raise your right hand.

8          (Jury sworn)

9          THE COURT:  Okay.  What we're going to do now,

10    before we get started with the trial, is I'm going to just

11    give you a little sense of the procedures that will apply

12    throughout the trial and explain how the trial will take

13    place.  I know you may have been on juries before, and you

14    may have seen it on television, but every court operates a

15    little bit differently, so I just want to just give you

16    somewhat of an orientation at the outset.  These will be no

17    substitute for the detailed legal instructions that I will

18    give you at the end of the case.

19         First thing is if they aren't there already, there

20    will soon be notebooks given to each one of you.  Some

21    jurors find it useful to take notes.  Some jurors find it

22    distracting to take notes.  It's entirely up to you whether

23    you want to take notes or not.  You should feel free to

24    write down whatever you like, as much or as little.  We will

25    lock your notes in the courtroom overnight so they will

1    always be confidential, and we will destroy them at the end

2    of trial.

3         As I said at the outset, this is a civil case

4    brought by Ms. Burton, who you met earlier.  Ms. Burton

5    worked at HUD previously.  In 2008 she filed a

6    discrimination complaint with the Equal Employment

7    Opportunity Commission against her then-supervisor.  The

8    parties settled that complaint in 2009.

9         Pursuant to that settlement agreement, Ms. Burton

10   was reassigned to a new office within HUD and was placed

11   under new supervisors.  Ms. Burton, however, alleges that

12   after one of her new supervisors learned of her prior

13   discrimination complaint, she began to be harassed at work

14   and was ultimately forced to resign.  This lawsuit alleges

15   that HUD unlawfully retaliated against Ms. Burton for

16   engaging in the protected activity of filing a

17   discrimination complaint.

18        As I said, HUD denies Ms. Burton's allegations.

19   Its position, I understand, will be that any personnel

20   actions taken against her were taken for legitimate,

21   nonretaliatory reasons.

22        It will be your job at the end of the evidence in

23   this case to determine whether Ms. Burton has proved her

24   case by a preponderance of the evidence, and at the end of

25   the case I will give you a lengthy set of instructions on

1        the law and how to apply the law in reaching your decision.

2               You will hear me refer occasionally to the

3        plaintiff and the defendant.  The plaintiff in the case is

4        Ms. Burton.  The plaintiff is the person who brings the

5        lawsuit.  I will also refer to plaintiff's counsel, who is

6        counsel who is representing the plaintiff in this case.

7               If I refer to the defendant, that will be to HUD

8        or HUD's lawyers.

9               The first step of the trial will be opening

10       statements.  The plaintiff will give its opening statement

11       first followed by the defendant.  The opening statement in a

12       case is not evidence.  It's simply designed as a road map to

13       summarize for you what the evidence in the case will show

14       from each side's perspective.

15              The second stage of the case will be the

16       presentation of evidence.  Again, we will proceed in the

17       same order.  The plaintiff will call witnesses in its case-

18       in-chief.  The defendant will then call its witnesses, and

19       the plaintiff may then choose to bring a brief rebuttal

20       case.  And within each side's case will be a direct

21       examination, a cross-examination by the opposing side, and

22       then a brief rebuttal examination.

23              The next stage of the case will be closing

24       arguments where the parties will summarize their positions

25       on the evidence that has been admitted before you.

1          Finally, I will give you a few instructions, and

2     then you will deliberate and hopefully reach a verdict on

3     the case.

4          You'll notice that there are eight of you.  This

5     is a civil case.  Civil cases in federal court require at

6     least six jurors.  That's unlike criminal cases, which

7     generally require twelve jurors.  I typically impanel eight

8     jurors to hear the case.  There are no alternates.  In some

9     other cases you may have been on there may have been

10    alternate jurors.  So each of you will hear the evidence in

11    the case, and each of you will deliberate and help to reach

12    a verdict.  It's always struck me that it would be

13    frustrating to serve on a jury, to hear all the evidence,

14    and then be told that you're not a -- that you're an

15    alternate juror and won't be able to deliberate, which is

16    why I select eight jurors.

17         So your responsibility as jurors are as judges of

18    the facts.  You are the ultimate decider of the facts in

19    this case.  You weigh the evidence, you judge the

20    credibility of the witnesses and the believability of the

21    witnesses, and you decide how much weight to place on the

22    evidence that has been admitted at trial.

23         You will hear me occasionally sustain or overrule

24    evidentiary objections.  One of my roles is to make sure

25    that the trial proceeds fairly and efficiently.  My other

1       primary role is to rule on evidentiary objections.

2               If I sustain an objection, that means you must

3       disregard the question and any answer that has been given.

4       If I overrule an objection, that means that you may consider

5       the question and the answer in your assessment of the facts.

6       And you should not fault either side from making evidentiary

7       objections.  It's their obligation to their clients to do

8       that and to ask me to make rulings, and it's my

9       responsibility to rule on their objections.

10              Very important.  Don't discuss the case with

11      anyone.  As I said before, there's a temptation to get home

12      tonight and talk to your friends or significant others or

13      family members about what kind of case you've been assigned

14      to.  Feel free to say it's, you know, an employment case,

15      but other than that, please don't go into any details, and

16      certainly don't discuss the evidence with your fellow jurors

17      until all of the evidence is in and you retire to the jury

18      room to begin your deliberations.

19              One area that courts have gotten into sort of

20      troublesome areas before is jurors doing independent

21      research on the Internet or using social media to talk about

22      the case or going to the, you know, Twitter feed or the

23      Facebook page of parties in the case.  I would ask you not

24      to do that for a couple of reasons.  First, you know, not

25      everything that you read on the Internet is true.  And

1    second, both sides deserve a verdict in this case based

2    simply on the evidence, and when jurors go beyond the

3    evidence and start doing independent research in other areas

4    of investigation like that, it deprives the parties of their

5    right to have a verdict based solely on the evidence.

6            So we'll all be spending time in this courthouse

7    over the next week probably.  You will undoubtedly run into

8    attorneys.  You'll run into court staff.  You may run into

9    me.  If they don't say hello or if they don't engage you in

10   conversation, they're not being rude.  They're simply

11   following my instructions.  So, you know, it's okay to say

12   "Good morning, how are you?" but apart from that, I would

13   ask you to steer clear of any conversations with either the

14   parties or me or my staff.

15           It is, I think, unlikely, but there is a

16   possibility that there may be media interest in the case.

17   Please do not speak with any members of the media regarding

18   the case while the trial is going on.

19           Ms. Moreira, as I said before, is one of the best

20   in the business.  She will be taking down everything that is

21   said during the trial, but you will not get a copy of the

22   transcript when you go back to retire.  So, again, if you

23   would like to take notes, you should feel free, or you can

24   simply rely on your memory, but you will not receive a copy

25   of the transcript during your deliberations.

 1                 Mr. Temple, Mr. Taaffe, do you want to approach

 2      quickly?

 3                 (The following is a conference held at the

 4                 bench outside the hearing of the jury)

 5                 THE COURT:  Ready to go?

 6                 MR. TEMPLE:  Yes.

 7                 THE COURT:  20 minutes about?

 8                 MR. TEMPLE:  What's the Court's prognosis?

 9      Opening statements, then lunch, then we proceed in the

10      afternoon?

11                 THE COURT:  Well, it depends on how long you go.

12      I have something at -- I'd like to get them both in, if we

13      can.  I have a criminal matter at 12:30.  That gives us an

14      hour.

15                 MR. TEMPLE:  The Court's got to eat lunch.

16                 THE COURT:  I'll deal with that.

17                 MR. TAAFFE:  I think I've got 15 minutes.

18                 THE COURT:  Okay.  So let's try to do them both.

19                 MR. TEMPLE:  You've got a 15-minute opening?

20                 MR. TAAFFE:  Yes, about.

21                 THE COURT:  20 minutes?

22                 MR. TEMPLE:  Yes.

23                 THE COURT:  Tops.

24                 MR. TEMPLE:  Yes.

25                 THE COURT:  Okay.

```
1              MR. TEMPLE:  Is that immediately, I guess?

2              THE COURT:  Yes.  Let's go.

3              MR. TEMPLE:  I just wanted to know.

4              (This is the end of the bench conference)

5              THE COURT:  Okay.  Ladies and gentlemen, the

6    plaintiff's counsel, Mr. Temple, will proceed with his

7    opening statement in the case.

8              Mr. Temple, hold on, let's distribute the

9    notebooks before you start.

10             MR. TAAFFE:  Mr. Field is doing the openings.

11             THE COURTROOM DEPUTY:  Counsel, do either one of

12   you intend to walk around?

13             MR. TEMPLE:  Yes.

14             THE COURTROOM DEPUTY:  Thank you.

15             THE COURT:  Okay.  Please proceed.

16             MR. TEMPLE:  From saint to sinner.  From saint to

17   sinner.  This case is about an employee who worked for the

18   federal government in the United States Congress for ten

19   years, left, and worked in the Department of Transportation

20   in the secretary's office for approximately 20 years doing

21   congressional relations without a single personnel blemish,

22   no disciplinary history, commendable performance, and then

23   moves to HUD.  Shortly after being at HUD, she encounters an

24   experience that has altered her life and brought her to you

25   today for your deliberation.
```

1           Good afternoon.  Good morning.  May it please the

2     Court, Counsel, ladies and gentlemen of the jury.  My name

3     is Donald Temple.  I'm accompanied by Theresa Owusu as my

4     co-counsel, and we are honored to represent Ms. Sandra

5     Burton.

6           In a few months, Ms. Burton is going to turn 68

7     years old.  She came to D.C. -- and I'm going to show you

8     her background.  She came to D.C. from a farm town in Iowa

9     and put her roots here and kind of self-started, went to

10    school, ultimately got her degree and started working in

11    different government jobs.

12          She's educated.  She's a bootstrapper.  She's a

13    hard worker.  She's extremely knowledgeable about the work

14    that she does.

15          Come 2006 we're going to show you that she moved

16    to HUD in the area of contract procurement.  Around 2008 she

17    encountered some work-related problems in the area of

18    discrimination.  We don't need to delve into that except to

19    say that in 2008, pursuant to her discrimination claims, she

20    filed an EEO matter and entered into a settlement agreement.

21          HUD's policies are -- and you're going to hear

22    from both sides -- that that settlement agreement process is

23    confidential.  Every one of its witnesses is going to

24    testify that that particular settlement was, quote-unquote,

25    extremely confidential.

1         Notwithstanding that settlement agreement, she

2    subsequently incurred problems with the settlement agreement

3    in 2009.  As a result of the settlement agreement what's

4    instructive is that she was permitted to telework two days a

5    week, which was a standard practice at HUD, quite frankly.

6         2010 -- and this case -- to give you some

7    backdrop, this case involves the timeline, for purposes of

8    the claims that are before you, of two claims of

9    retaliation.  It involves the timeline 2010, June to

10   approximately December 2011.

11        It's in 2010 at HUD where Ms. Burton was assigned

12   a supervisor by the name of Elie Stowe.  You're going to

13   hear some names and at times it may be a little confusing,

14   but this is still in the office of contract procurement.

15        Now, in that office, Ms. Stowe has a chain of

16   command.  You're going to hear that term.  The people who

17   are above the people who are being referenced at different

18   points in time.  In June 2010 Ms. Stowe is in Ms. Burton's

19   chain of command, and above Ms. Stowe is a woman named

20   Jemine Bryon.

21        And then there are going to be other names that

22   you hear.  One of them is going to be Priscilla Lewis.  Who

23   is Priscilla Lewis?  What we will show you is that Priscilla

24   Lewis is involved in this process.  She's the single

25   individual and link who is involved in the process from the

1    settlement agreement in 2009 through the termination,

2    proposed termination, in 2011, which forced Ms. Burton out

3    of the agency and to resign.

4              You're also going to hear -- and what's

5    significant on the front end, given the confidentiality

6    of the confidential agreement, is that Ms. Priscilla

7    Lewis was the custodian of the agreement, and not only does

8    she lock it in a file cabinet, but her office was locked,

9    and the key was placed into an independent drawer.

10   Notwithstanding that, somehow -- and defendant will not be

11   able to tell you or to explain to you how -- Ms. Stowe

12   acquired knowledge about the confidential, locked-away

13   settlement agreement in Ms. Priscilla Lewis's file cabinet.

14             Shortly after Ms. Stowe started working at HUD and

15   supervising Ms. Burton, she confronts Ms. Burton, and she

16   says, I know essentially about your agreement.

17             Ms. Burton is alarmed, if not horrified.  She's

18   just been through one process thinking that she had a

19   confidential agreement.  She has a new supervisor who

20   approaches her about something that she thought was

21   confidential, and she reacted.

22             Shortly after that, there was a strange

23   communication and dynamic between Ms. Stowe and Ms. Burton.

24   Ms. Stowe approaches Ms. Burton and begins to talk about

25   things like, "You're not a lawyer."  "I know about your

1     agreement."  "You know what?  Jemine Bryon hates you."

2     These are all peculiarities to Ms. Burton, who is now even

3     more alarmed by a new supervisor who begins to show some

4     signs of being strange in the manner in which she's treating

5     her.  She also slowly but surely begins to threaten

6     disciplinary action against Ms. Burton.

7             What's critical to understand as we dissect these

8     facts -- and you, ladies and gentlemen, are the judges of

9     these facts.  Your job is going to be to take them and to

10    weigh them.

11            As you distill these facts, you're going to learn

12    that Ms. Burton is not just an employee that's doing

13    contracts.  She also has an appointment to work in the

14    accounting of the contracts and is a liaison with the Office

15    of the Inspector General.  And there's a peculiarity, and

16    she's going to tell you that that shoe that she wears simply

17    doesn't fit because she's put in a position where the

18    inspector general is asking for critical, sensitive contract

19    information, and her supervisors have to provide that

20    information, and she can't necessarily provide or help them

21    provide information that they should have for the inspector

22    general.  There is going to be a significant amount of

23    communications regarding that and a program called ARCATS.

24            Come 2010, August, after Ms. Burton starts seeing

25    these various reactions, things start happening between her

1    and Mrs. Stowe.  We don't have a lot of time here, but I

2    just want to give you the narrative because what's going to

3    happen here is Ms. Burton is apprehensive.  She's disturbed.

4    She doesn't know what to do.

5              What she does do consistently is she begins to

6    complain about what's happening with Ms. Stowe, but nobody

7    in management wants to validate or appreciate it nor

8    fundamentally objectively investigate it, impartially

9    investigate it.  There becomes this dispute that's heated

10   between Ms. Stowe and Mr. Burton, and Ms. Burton's testimony

11   is that Ms. Stowe consistently threatens her and goes off

12   on her and screams at her, but what's going on here -- and

13   this is what this case is fundamentally about -- is that

14   there is a systematic, collaborative effort to retaliate

15   against Ms. Burton and ultimately to achieve her demise.

16             Within the time period of August 2010 through

17   September 2011 Mrs. Burton, who has worked for the United

18   States government and performed without blemish, with

19   commendable performance achievements and performance

20   evaluations, is sanctioned.  She's counseled, then she gets

21   a five-day suspension.

22             Then Ms. Stowe and she have an exchange.

23   Ms. Stowe then begins to call security to put Ms. Burton out

24   of the agency.  Additionally, she's then given a 30-day

25   suspension.

1          And there are two significant events that will

2     come into play; one in November 2010 and one in February

3     2011.

4          What you're going to learn is that there are some

5     differences in terms of performance issues, but we will

6     underscore for you this is not a case where there's any

7     question, not a scintilla of evidence, that's going to show

8     that Ms. Burton did not perform her job.

9          In fact, when she was assigned to the ALO position

10    and working with the Office of Inspector General, there was,

11    you'll learn, a backlog of some two to three years.  You'll

12    learn that she worked very diligently.  We're going to show

13    you documents to verify her performance levels until the

14    Stowe incident, a nightmare for her.

15         Subsequent to these -- contemporaneous with these

16    Stowe incidents, Ms. Burton, she went to Mr. Surber, and she

17    complained.  You're going to find out that she went to EEO,

18    and she filed yet a second complaint, as the judge has told

19    you, in March 2011.

20         Subsequent to the second complaint, things only

21    got worse.  They only got worse.

22         Ultimately, there was a proposal to remove

23    Mrs. Burton from HUD.  The Court's going to instruct you

24    about the law, but against that backdrop we're going to show

25    you through the government's witnesses that there was a

 1      pretext, a basic fraudulent effort, to remove Ms. Burton

 2      when Keith Surber, the deciding official, was appointed to

 3      decide whether she should be fired.

 4              Subsequent to that time, while that process is

 5      going on, during the pendency of an EEO investigation,

 6      you'll hear the term "report of investigation."  Ms. Burton

 7      is then -- to preserve the years in government time, she

 8      then -- to preserve it and not be terminated subject to a

 9      finding that she should be terminated, she then resigns, and

10      that's what brings us here today.

11              There's a lot more meat that's going to go on

12      those bones in the next couple of days.  Then we'll

13      return to you at the conclusion of the case and try to

14      connect the dots and show you why, as we perceive the case

15      and based upon the evidence, a verdict should be rendered on

16      Ms. Burton's behalf.

17              So I'm going to thank you in advance for your time

18      and attention.

19              THE COURT:  Thank you, Mr. Temple.

20              Mr. Field.

21              MR. FIELD:  Good morning, and as I mentioned

22      before, my name is Brian Field, and I, along with my

23      colleague Damon Taaffe, are attorneys with the Department of

24      Justice.  In this case, we represent, as the judge mentioned

25      earlier, the Department of -- or the secretary of the

1   Department of Housing and Urban Development or HUD.  With us

2   at counsel table is Nicole Drew, who is an attorney with

3   HUD.

4         This case is about a HUD employee, Ms. Burton, who

5   was warned by no fewer than four separate supervisors that

6   her conduct was insubordinate and that it was inappropriate.

7         And additionally she was warned that that

8   insubordination would lead to discipline.  In fact, it did

9   lead to discipline.  It led to a memorandum of counseling,

10   it led to a five-day suspension, and it led to a 30-day

11   suspension.

12         But this case boils down to a HUD employee,

13   Ms. Burton, who simply refused to change her insubordination

14   at any point until she ultimately left the federal service.

15         Now, what conduct?  You might ask.  We'll discuss

16   it in a bit more detail momentarily, but what you will see

17   in this case is Ms. Burton telling her supervisors to,

18   quote, back off, and then you'll see Ms. Burton telling her

19   supervisors that they don't have the authority to tell her

20   what to do, they don't have the authority to assign her

21   tasks.

22         Additionally in this case you'll see that

23   Ms. Burton made a practice of copying people who didn't even

24   work for HUD on to emails that included confidential audit

25   information about HUD.  But in addition to hearing about

1       these things that she did, you're going to hear some

2       evidence and see some evidence about what she did not do,

3       and mainly that was her job.

4               You'll see that she refused to attend meetings.

5       Now, we heard a little bit about this audit liaison officer

6       and the role that that position has with attending meetings

7       with the Office of the Inspector General.  Well, you'll see

8       that she didn't attend those meetings.

9               And additionally, you'll see that Ms. Burton

10      teleworked a few days a week, but you'll see that Ms. Burton

11      told her supervisors that she wouldn't answer their phone

12      calls while she was teleworking.

13              At each step along the way you'll see that

14      Ms. Burton was warned, and you'll see that HUD gave her

15      chance after chance after chance to change her conduct, but

16      she simply refused to do so.  And as she was warned, she was

17      disciplined, and then she was disciplined again.  And when

18      her conduct still didn't change, she was disciplined yet

19      again.

20              For instance, she was removed by security for,

21      quote, threatening behavior, but yet she did not change.

22      And then she was put on to administrative leave for, quote,

23      extremely unprofessional and threatening behavior, unquote,

24      and yet you'll see that her conduct did not change.  And

25      then she was placed on a five-day suspension for, quote,

1    disrespectful and abusive behavior toward your supervisor,

2    unquote, and yet you'll see that she didn't change.

3            Then, a few months later, she was placed on a

4    30-day suspension for, quote, failure or willful delay in

5    carrying out instructions in a reasonable time, being absent

6    without leave or AWOL, and also making false, malicious, and

7    unfounded accusations against your supervisor, unquote.  And

8    yet, even after that, you will see that she refused to

9    change her conduct.

10           Ultimately then her supervisors determined that

11   the only discipline remaining was removal, and they, in

12   fact, proposed her removal for failure to follow

13   instructions and for conduct unbecoming a federal employee.

14   And just before that proposed removal was approved, Ms.

15   Burton retired.

16           Now, what you're going to hear in this case --

17   you're going to hear Ms. Burton claim that all of this

18   discipline and all of the ways in which she was treated was

19   actually retaliation for an old settlement agreement.

20   Specifically back in 2008 Ms. Burton filed a race

21   discrimination claim against previous supervisors.  She

22   settled that claim in 2009.  After that settlement, she

23   moved over to the policy office within the office of the

24   chief procurement officer.  It's the OCPO that we've been

25   discussing.  It's in that office, under these new

1   supervisors, that Ms. Burton claims she was retaliated

2   against because of that old settlement agreement involving a

3   different office and involving different supervisors.

4          But we'll submit that the evidence won't, in fact,

5   show that.  Rather, the law is clear.  It's not enough to

6   make allegations that you're retaliated against.  Ms. Burton

7   must prove it.  She has the burden.  And the law is clear

8   that she must show that her discipline and the treatment

9   about which she complains was because of that old settlement

10  agreement, not because of the well-documented

11  insubordination and misconduct.

12         But instead what you'll see in the evidence is

13  example after example after example of insubordination.  You

14  will see that that insubordination occurs oftentimes after

15  she's been warned, but it just continues.  And through that,

16  you will see that it was this misconduct and insubordination

17  that led to her discipline, not the settlement agreement.

18         Now, before I go in a little bit to what the

19  evidence -- some of the evidence that you'll see will be, I

20  think it's important to cover a few acronyms and a few names

21  you're going to hear.  You've heard some of them already,

22  and I just want to make sure that we're clear on who's who

23  and what's what.

24         First, the OCPO you've heard reference to a few

25  times.  That is the office of the chief procurement officer

1    within HUD.  That was the general division within which

2    Ms. Burton works.

3           The head of that office, its executive, is a CPO,

4    the chief procurement officer, and then the other acronym

5    that's important to keep in mind and that we both mentioned

6    here is the ALO.  That's the audit liaison officer.  That's

7    the position that Ms. Burton held.  That is a role that she

8    held, and that is the role in which she was obligated to

9    attend these meetings with the Office of the Inspector

10   General, and that's the role in which she acted as liaison

11   between the OCPO and groups like the Office of the Inspector

12   General.  Her job was to facilitate the transfer of

13   information to those organizations.

14          In addition to Ms. Burton's name, I think there

15   are four names that are important to keep in mind.  First is

16   Keith Surber.  Keith Surber was the deputy chief procurement

17   officer.  He was never Ms. Burton's supervisor.  He worked

18   with her immediately upon her arrival in the policy division

19   in 2009, and he immediately saw her insubordination.

20          Then we fast forward to 2010 -- I'm sorry, 2009.

21   Jemine Bryon joins.  She joins as CPO, the head of this

22   division.  Because of a few vacancies in some positions she

23   was actually Ms. Burton's first-level supervisor, and she

24   experienced Ms. Burton's insubordination firsthand.

25          Then we get to 2010.  Elie Stowe arrives.

1    Ms. Stowe slots in right under Ms. Bryon as the assistant

2    chief procurement officer, and she becomes Ms. Burton's

3    first-line supervisor.  She also experiences Ms. Burton's

4    insubordination firsthand, and you'll hear her testimony

5    about that.

6          Now, I need to note that unfortunately Ms. Stowe,

7    a little over a year ago, had a pretty severe stroke, and it

8    had an affect on her memory and her recollections.  She

9    remembers -- she'll join us and testify about what she does

10   remember from that era, and she'll do the best she can,

11   but what you're going to also see is evidence.  You're going

12   to see documentary evidence.  You're going to see emails

13   going from Ms. Burton to Ms. Stowe and back from Ms. Stowe

14   to Ms. Burton and amongst others in the organization that

15   will help to illuminate just the depth of insubordination in

16   this time.

17         And then lastly, the fourth name is David Blocker.

18   Mr. Blocker came in as the -- as Ms. Stowe's deputy, and as

19   that -- in that position, she became Ms. Burton's first-line

20   supervisor.  You will hear him testify also about her

21   insubordination, and you will see that he was the one who

22   actually proposed her removal.

23         You're going to hear from each one of them.  Each

24   one of those witnesses will testify that they saw

25   insubordination.  They saw refusal to attend meetings.  They

1       saw refusal to follow directions with respect to

2       assignments.  You will see each of them testify about

3       hostility from Ms. Burton.

4                But in this case, you're going to see -- you're

5       going to have more evidence than just their testimony.  In

6       this case you're going to see dozens of emails, and I would

7       submit maybe dozens upon dozens of emails.  And through

8       those emails you will see exactly the type of

9       insubordination and the type of conduct that these

10      supervisors and HUD officials were dealing with on a daily

11      basis.

12               As just an example of a few of those, you're going

13      to see a category of emails that are very inflammatory.

14      You're going to see a supervisor ask Ms. Burton for a status

15      update on a project.  And instead of providing a status

16      update, you're going to see Ms. Burton say, "You know what,

17      I don't care what you say at this point.  Make your move."

18               And then in another instance you're going to see

19      Ms. Burton tell her supervisors, "I will not come to your

20      office.  You need to come out to my cubicle.  And if there's

21      no one around my cubicle, you'll need to wait until somebody

22      is."

23               Then you're going to see Ms. Burton tell her

24      supervisor, David Blocker, on an email where David Blocker

25      simply answered a question, on this email with other people,

1    she told her supervisor in all capital letters to "Stop,

2    stop, stop sending these emails until you've checked with

3    me.  You don't know what is going on here so stop sending

4    these emails out until you check with me."  And you heard

5    that right.  She told her supervisor, cc'ing others, that he

6    needed to check with her before he did his job.

7         In addition, you're going to see a category of

8    emails that I've already referenced, which is the refusal to

9    do assignments.  You're going to see the refusal to attend

10   OIG meetings.  This is the Office of the Inspector General.

11   This is a core component of Ms. Burton's role as the ALO,

12   and you're going to see that she said, "I'm not going."

13   You'll see that she was told to go.  You'll see her respond,

14   "I'm not going."

15        And you'll see her tell her supervisor at this

16   point, "I will do no assignment."  And then you see her

17   telling Ms. Stowe, "You know what, Elie, if the deadline is

18   missed, so be it."  And what you'll see then is that

19   deadlines are missed.  You'll see representatives of the

20   Office of the Inspector General contacting the chief

21   procurement officer asking where the materials were that

22   they were waiting for.

23        And then in another category of emails you're

24   going to see Ms. Burton's practice of copying people on to

25   emails who had nothing to do with the email.  You'll see

1    that Ms. Burton had a practice of copying senior HUD

2    officials, all the way up to the cabinet level secretary, on

3    emails that were essentially daily gripes.  You'll see she

4    was told not to.  Ms. Bryon, in fact, told her not to, and

5    you will see that she responded not by taking those people

6    off emails, but by saying, "I'm going to do what I need to

7    do.  You should back off."

8            And then you'll see she also had a lot of

9    confidential HUD audit information in emails, and she made a

10   practice of copying people who don't even work for HUD.

11   You'll see that her first-level supervisor told her to stop.

12   You will see her second-level supervisor told her to stop.

13   And then you'll see that her third-level supervisor,

14   Ms. Bryon, told her to stop, and you'll see that she

15   continued to do it anyway.

16           Lastly, you're going to see emails and hear some

17   testimony about hostility.  You're going to see that

18   Ms. Burton berated one of her colleagues so severely that

19   that colleague sent an email to her own supervisor and to

20   the union asking to be moved to a different office away from

21   Ms. Burton.  And then you're going to hear about two

22   separate instances where Ms. Burton was yelling so loudly at

23   Ms. Stowe, her supervisor, that multiple people in the

24   office documented the event in emails.  You'll see that each

25   of those emails state that it was Ms. Burton who was yelling

1    and also that they note the negative effect that it is

2    having on the office.

3              Ultimately, you'll see that Ms. Burton had chance

4    after chance.  You'll see a series of discipline, and you'll

5    see that that discipline was specifically intended to,

6    quote, impress upon you the importance of deterring such

7    misconduct in the future, but instead you will see that

8    Ms. Burton would not be deterred.

9              Now, it's equally important to talk briefly about

10   what you're not going to see in this case.  To be sure, you

11   may hear some testimony that Ms. Stowe was a very direct

12   manager, that she had a way she wanted things done and

13   sometimes micromanaged.

14             You'll see -- you may hear testimony that

15   Ms. Burton had a satisfactory performance rating and

16   performance record earlier in her federal career, and you

17   may even hear Ms. Burton testify that she didn't feel like

18   she was getting the support that she wanted or needed from

19   her supervisors within the policy division.

20             But we submit that you will not see that any of

21   the discipline had anything to do with the settlement

22   agreement, and you need to remember what Ms. Burton must

23   prove.  She has the burden of proving that all of this

24   discipline and treatment about which she complains was

25   because of that old settlement agreement against those old

1      supervisors in that old office.

2            Ultimately, the insubordination occurred well

3      before Ms. Stowe ever arrived at HUD.  It continued through

4      the end of Ms. Burton's tenure at HUD.  She received

5      numerous warnings, and the insubordination followed every

6      single warning, and thus, after you've heard all the

7      evidence in this case, we will ask you to conclude that

8      Ms. Burton has not proven that her discipline was because of

9      that old settlement agreement, and thus we'll ask you to

10     enter a verdict in the favor of the defendant.

11           Thank you.

12           THE COURT:  Thank you, Mr. Field.

13           Okay.  Ladies and gentlemen, we will get started

14     every morning around 9:00.  We'll take a 15-minute break in

15     the morning.  We will break for lunch in the 12:15/12:30

16     time period, depending on how the evidence is going.  We

17     will generally take about an hour and 15 minutes for lunch,

18     then we'll do the same thing in the afternoon, and we'll try

19     to get you out of here as close to 5:00 as possible.

20           Ms. Jenkins will take you back now to the jury

21     room.  You can get settled.  That will be your home away

22     from home for the next few days at least, and then have a

23     good lunch, and we'll see you back here about 1:20, let's

24     say, and we'll begin with the evidence in the case.  Okay?

25           So you can leave your notebooks on your chair, if

```
 1    you'd like.  And no discussions about the case, no research
 2    about the case.
 3                (Jury exits courtroom)
 4                THE COURT:  Okay.  Mr. Temple, who do we have
 5    first after lunch?
 6                MR. TEMPLE:  Keith Surber.
 7                THE COURT:  And what's the line-up after that?
 8                MR. TEMPLE:  We were discussing that it's likely
 9    Priscilla Lewis.
10                MR. TAAFFE:  We'll check on Ms. Lewis.  The
11    latest was we had had Sandy Krems next, and I'm not sure if
12    Ms. Lewis is actually available today or not.
13                MR. TEMPLE:  We actually had another witness that
14    we resolved today that there were some issues about and we
15    decided not to call.
16                MR. TAAFFE:  Are you going to do Krems or Lewis
17    next?
18                MR. TEMPLE:  Lewis.
19                MR. TAAFFE:  Okay.  We'll try to get Ms. Lewis
20    here.
21                THE COURT:  Okay.  Now, I see that I have the
22    joint exhibits.  Do I have the deposition transcripts?
23                MR. TEMPLE:  Yes, Your Honor.
24                THE COURT:  I don't need them now, Mr. Temple,
25    just before we restart.
```

1              MR. TEMPLE:  I'll give them to you for each

2      witness.

3              THE COURT:  Just give me all of them at the same

4      time.

5              MR. TEMPLE:  Okay.

6              THE COURT:  Okay.  And do we expect to stick to

7      the joint exhibits, or will there -- do you anticipate

8      evidentiary objections to other exhibits?

9              MR. TEMPLE:  There are -- we do.

10             THE COURT:  You expect to stick to the joint

11      exhibits?

12             MR. TEMPLE:  The latter.  There are joint, and in

13      addition to that, there will be separate and distinct to

14      which there will be possibly objections, object objections.

15             THE COURT:  Okay.  And I know we went through

16      some of the exhibits at the pretrial.  Do those relate to

17      Mr. Surber or Ms. Lewis or Ms. Krems?  In other words, are

18      there any areas of exhibits that you anticipate objections

19      to this afternoon?

20             MR. TAAFFE:  On the defense exhibits, there are a

21      number relating to Tonya Houston, which, of course, we've

22      talked about extensively.

23             THE COURT:  Right.

24             MR. TAAFFE:  I don't know off the top of my head.

25      There was also one that I believe was the latter that we

1    referred to earlier that Mr. Temple wrote to Secretary

2    Donovan.  I don't know what he intends to cover with

3    Mr. Surber so I can't quite anticipate everything.

4              THE COURT:  Do you plan on getting into that

5    today?

6              MR. TEMPLE:  Yes, sir.

7              THE COURT:  All right.  Give me a copy of that

8    letter, please.  I know you did the last time, but I want --

9    I don't have it handy.

10             MR. FIELD:  Your Honor, I believe there is a

11   plaintiff exhibit binder up there.  The letter that was

12   referenced was Plaintiff's Exhibit 31.

13             THE COURT:  Okay.

14             Okay.  My Plaintiff's 31 is an email.

15             MR. FIELD:  Your Honor, is that the binder that

16   was provided this morning?  Is it a black or a white binder?

17             THE COURT:  It's a black binder.  It was the one

18   that was provided the last time.

19             MR. FIELD:  Yes.  So this morning I gave -- I

20   provided a copy of all new exhibit binders, and there should

21   be three white binders.

22             MR. TAAFFE:  I can give a hard copy of the email

23   to you, if you want it.

24             THE COURT:  Okay.  Hold up.

25             And you intend to use this with which witness,

1     Mr. Temple?

2                 MR. TEMPLE:  Yes, Your Honor.

3                 THE COURT:  Which one?

4                 MR. TEMPLE:  Mr. Surber.

5                 THE COURT:  Okay.  I'll take a look over the

6     break, and we'll discuss it before he testifies.

7                 Anything else?

8                 MR. TAAFFE:  No.

9                 THE COURT:  Okay.  See you at about 1:20.

10                 (Lunch recess taken)

11

12              **CERTIFICATE OF OFFICIAL COURT REPORTER**

13

14                 I, LISA A. MOREIRA, RDR, CRR, do hereby

15     certify that the above and foregoing constitutes a true and

16     accurate transcript of my stenographic notes and is a full,

17     true and complete transcript of the proceedings to the best

18     of my ability.

19        Dated this 10th day of July, 2017.

20

21                                 /s/Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
22                                 United States Courthouse
                                   Room 6718
23                                 333 Constitution Avenue, NW
                                   Washington, DC 20001
24

25